Linda LANG and Michael Lang, Plaintiffs,

NORTHWESTERN MUTUAL HEALTH CARE BENEFITS PLAN and West Bend Mutual Insurance Company, Involuntary Plaintiffs,

v.

Terry LOWE, Wisconsin Hospitality Group and Fireman's Fund Insurance Company, Defendants-Appellants,†

FRANKENMUTH INSURANCE COMPANY, Defendant-Respondent,

AMERICAN AUTOMOBILE INSURANCE COMPANY, Commerce and Industry Insurance Company, and Axis Surplus Lines Insurance Company, Defendants,

HUMANA INSURANCE COMPANY, Intervenor.

Court of Appeals

*No. 2011AP1742. Submitted on briefs May 8, 2012.*
*—Decided July 24, 2012.*

2012 WI App 94

(Also reported in 820 N.W.2d 494.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Beth Ermatinger Hanan* of *Gass Weber Mullins LLC*, and *Thomas E. Goss Jr.* of *Mueller Goss & Possi, S.C.*, of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Susan R. Tyndall* of *CMT Legal Group, Ltd.* of Waukesha.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Terry L. Lowe, Wisconsin Hospitality Group (generally referred to as "Pizza Hut"), and Fireman's Fund Insurance Company[1] appeal from a judgment, entered upon a jury's verdict, declaring that: (1) the insurance policy issued by Frankenmuth Insurance Company to Lowe's primary employer—Unlimited, Inc.—does not provide coverage for damages arising from an accident that occurred while Lowe was using his primary employer's minivan to deliver pizzas for his secondary employer, Pizza Hut; and (2) Frankenmuth consequently has no duty to defend or indemnify Lowe or Pizza Hut for the accident. Lowe argues there was no credible evidence to support the jury's finding that he did not have Unlimited's permission to drive the minivan when he got into the accident. In the alternative, Lowe argues that he was able to give himself permission to drive the minivan for whatever purpose he chose because he was the van's "real owner" under the criteria established by *American Family Mutual Insurance Co. v. Osusky*, 90 Wis. 2d 142, 147–48, 279 N.W.2d 719 (Ct. App. 1979), and, therefore, Frankenmuth had a duty to indemnify under its policy. Lowe also argues that the trial court erred in declining to give his proposed expanded instruction regarding implied ownership to the jury. For reasons we explain below, we reject his arguments and affirm the judgment.

---

[1] Hereafter we will refer to the appellants collectively as "Lowe."

## BACKGROUND

¶ 2. Lowe had been working as a production manager for Unlimited, a local manufacturer of replacement vinyl windows, for about two years when he asked for a raise. Unlimited, not in a position to give raises at the time, offered him the use of a company car.

¶ 3. To this end, Unlimited added another minivan to its existing fleet, and offered the van to Lowe. Unlimited bought the minivan and paid to insure it. The van was titled in Unlimited's name. Unlimited had an extra set of keys in case someone else needed to use the van. Lowe was responsible for fuel and maintenance. Although Lowe did not know what would happen to the minivan if he left his position at Unlimited, according to Tom Bellart, Unlimited's secretary-treasurer, the minivan would be used for another aspect of Unlimited's business if Lowe terminated his employment with the company.

¶ 4. Initially, Unlimited put no restrictions on Lowe's use of the van. Lowe used the minivan as his own—to drive to and from work, for personal trips, and, on occasion, for use in Unlimited's business.

¶ 5. That changed, however, in November 2007, when the Unlimited management team learned that Lowe was using its van to deliver pizzas for Pizza Hut. Lowe had taken additional part-time work with Pizza Hut a couple of months earlier, and had been using the minivan that Unlimited had provided for him for deliveries. Management approached Lowe after a production meeting to discuss the matter. According to Bellart and John Maniaci, Unlimited's vice-president, the management team was upset that Lowe was using Unlimited's vehicle to make money for another company. They considered it unfair. The additional mileage diminished

54

the vehicle's value and added wear and tear. Unlimited also felt the use exposed the company to a risk of liability.

¶ 6. According to Maniaci and Bellart, the management team told Lowe at the November 2007 meeting that he was not to use the minivan to deliver pizzas. While Maniaci could not remember the exact words he used when speaking to Lowe, he testified at trial that "[Lowe] was using the vehicle to make extra money and it was our vehicle and I tried to convey . . . that I thought that was wrong." Likewise, Bellart recalled that the conversation was "pretty straightforward," in that Lowe was not to use the van to deliver pizzas. According to Bellart, "[a]nybody leaving that meeting would have known they were not supposed to use the company vehicle to deliver pizzas." At this meeting, management offered to sell Lowe a Ford Taurus that was not being used by the company so that he could continue his part-time job at Pizza Hut without using Unlimited's van. Maniaci testified that the purpose of the November 2007 meeting was to offer to sell Lowe the Taurus "so he would stop using the van," and he recalled specifically telling Lowe to use the Taurus, rather than the company van, to deliver pizzas. The day after the meeting, the title to the Taurus was transferred to Lowe. Lowe paid for the car by having Unlimited deduct payments from his paycheck.

¶ 7. According to Lowe, no one expressly prohibited him from using the minivan for delivering pizzas. He did acknowledge, however, that Maniaci may have expressed a preference that he not do so, and that he instead use the Ford Taurus.

¶ 8. Lowe continued to use the minivan to deliver pizzas for Pizza Hut, and was delivering pizzas for Pizza Hut in April 2008 when he was involved in an

accident. According to Lowe, he was "chewed out" by Unlimited management afterward. Also, after the accident, Lowe was no longer allowed to drive the minivan. When Lowe asked management to use another company car, management refused to let him do so. According to Maniaci, "we felt he abused the privilege [and] went against our wishes."

¶ 9. Linda Lang, whom Lowe struck while driving the minivan, sued Lowe, Pizza Hut, Pizza Hut's insurers—including Fireman's Fund—and Unlimited's insurer, Frankenmuth, for damages.

¶ 10. Frankenmuth consequently filed a motion for a declaration that it had no duty to defend or indemnify Lowe or Pizza Hut. Frankenmuth argued that its policy did not cover Lowe while he was driving the minivan for Pizza Hut because he did not have Unlimited's permission to drive the van for that purpose. Frankenmuth based its argument on the policy's "permissive use" provision, which provided: "[w]e will pay all sums an 'insured' must legally pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.' " The policy listed the minivan as a covered auto. As pertinent here, the policy listed those qualifying as an "insured" as: "[y]ou for any covered 'auto;' " and "[a]nyone else while using with your permission a covered 'auto' you own, . . . *except* . . . [y]our 'employee' if the covered 'auto' is owned by that 'employee' or a member of his or her household." (Emphasis added.)

¶ 11. The trial court bifurcated trial to determine the insurance coverage issue, and on March 15, 2011, a one-day jury trial was held. Three witnesses testified: Lowe, Maniaci, and Bellart.

¶ 12. At the jury instruction conference, there was a dispute about what the verdict would say. The trial court indicated that the question for the jury would be whether Lowe had "the express or implied permission by Unlimited, Inc. to drive the minivan for the purposes of delivering pizzas at the time of the accident." Counsel for Lowe proposed an expanded jury instruction that included additional factors—including the factors used to determine whether a permitted user of a vehicle was in fact the vehicle's "real owner," as defined by *Osusky*—to be considered in determining whether Lowe had implied permission to use the minivan to deliver pizzas. The trial court denied the expanded instruction, but told counsel he was "free to argue" the additional factors.

¶ 13. The jury found that Lowe did not have express or implied permission to drive the minivan for the purpose of delivering pizzas for Pizza Hut at the time of the accident. Lowe subsequently filed motions after verdict, which the trial court denied. The trial court entered judgment on May 26, 2011, dismissing Frankenmuth as a party to Lang's suit. Lowe now appeals.

## ANALYSIS

¶ 14. Lowe makes three arguments on appeal. Lowe argues there was no credible evidence to support the jury's finding that he did not have Unlimited's permission to drive the minivan when he got into the accident with Lang. In the alternative, Lowe argues that he was able to give himself permission to drive the minivan for whatever purpose he chose because he was the van's "real owner" under *Osusky*, and, therefore, Frankenmuth had a duty to indemnify under its policy. Lowe also argues that the trial court erred in declining

to give its expanded instruction regarding implied ownership to the jury. We discuss each argument in turn.

*(a) There was credible evidence to support the jury's verdict.*

██

¶ 15. Lowe argues there was no credible evidence to support the jury's finding that he did not have Unlimited's permission to drive the minivan when he got into the accident with Lang. Lowe cites *Heaton v. Mountin*, 2000 WI App 45, 233 Wis. 2d 154, 607 N.W.2d 322, for the proposition that the jury should have considered the issue from *his* perspective, not Maniaci's or Bellart's. He argues that his testimony—including that Unlimited management expressed only a "preference" that he not use the van to make pizza deliveries but that there was no express "prohibition"—establishes that, from his perspective, he had permission to operate the van for any purpose. Lowe further argues that this evidence is strengthened by the fact that: (1) Maniaci could not recall the exact words he used to tell Lowe that he could not use the van to deliver pizzas at trial; (2) Unlimited never "monitored" Lowe's use of the van after the November 2007 meeting; (3) Unlimited never stopped paying insurance on the van; and (4) Unlimited did not take any further measures to restrict Lowe's access to the van, such as taking his keys. We disagree.

¶ 16. Our review of the jury's verdict in this case is narrow; we will sustain the verdict if there is any credible evidence to support it. *See Morden v. Continental AG*, 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. In applying this narrow standard of review, we must consider the evidence in a light most favorable to

the jury's determination. *See Stunkel v. Price Elec. Coop.*, 229 Wis. 2d 664, 668, 599 N.W.2d 919 (Ct. App. 1999). We do so because it is the role of the jury, not this court, to weigh the testimony of the witnesses and assess their credibility. *See Morden,* 235 Wis. 2d 325, ¶ 39. Thus, we must "search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not." *See id.* "[I]f the evidence gives rise to more than one reasonable inference, we accept the particular inference reached by the jury." *See id.*

¶ 17. In this case, there was credible evidence to support the verdict. As noted, Maniaci and Bellart both testified that the management team told Lowe at the November 2007 meeting that he was not to use the minivan to deliver pizzas. While Maniaci could not remember the exact words he used when speaking to Lowe, he testified at trial that "[Lowe] was using the vehicle to make extra money and it was our vehicle and I tried to convey . . . that I thought that was wrong." Likewise, Bellart recalled that the conversation was "pretty straightforward," in that Lowe was not to use the van to deliver pizzas. And, according to Bellart, "anybody leaving that meeting would have known they were not supposed to use the company vehicle to deliver pizzas." Maniaci further testified that the purpose of the November 2007 meeting was to offer to sell Lowe the Taurus "so he would stop using the van," and he recalled specifically telling Lowe to use the Taurus, rather than the company van, to deliver pizzas.

¶ 18. Given this credible evidence, we must sustain the jury's verdict that Lowe did not have permission to drive Unlimited's minivan for his pizza delivery job with Pizza Hut. *See id.,* ¶ 38. While Lowe directs our attention to evidence from which a jury could infer

59

that he did have permission to drive the van for any purpose, we again note that our role is not to reweigh the evidence or reassess witness credibility. *See id.*, ¶ 39. Our role is not to compare inferences. *See id.* Finally, contrary to what Lowe argues, *Heaton* does not stand for the proposition that we can only consider the issue of whether Lowe had permission from Lowe's point of view; in fact, Lowe has not provided a citation pinpointing where *Heaton* discusses this specific proposition. *See Madely v. RadioShack Corp.*, 2007 WI App 244, ¶ 22 n.8, 306 Wis. 2d 312, 742 N.W.2d 559 (we need not consider undeveloped arguments). We therefore conclude that the jury's verdict will stand.

*(b) Lowe was not the "real owner" of the minivan and Frankenmuth therefore had no duty to indemnify.*

¶ 19. Lowe also argues that, regardless of whether Unlimited gave him permission to drive the minivan to deliver pizzas, he was able to give himself permission to drive the van for whatever purpose he chose because he was the "real owner" of the minivan. *See Osusky*, 90 Wis. 2d at 146–47 ("As a general rule, where the first permittee is for all practical purposes the real owner . . . , although the car is titled, registered, and insured in the name of another for reasons of economy and convenience, and the first permittee grants permission to a third party to drive the insured vehicle, permission of the named insured is implied."). Lowe argues that he was the "real owner" of the van because he meets the five factors set forth by the supreme court for establishing "real" ownership in *Osusky*. *See id.* at 147. We disagree.

¶ 20. *Osusky* sets forth a five-factor test to determine whether a permitted user of the vehicle should be considered the "real owner" for insurance purposes. *See id.* Those factors are:

1. Whether the named insured considered the first permittee the actual owner;

2. The restrictions, if any, imposed by the named insured on the first permittee's use of the car (limited or unfettered with respect to time, place, purpose, drivers);

3. Whether the named insured knows, and does not object, that the first permittee allows others to drive the car;

4. The first permittee's financial interest in the car (purchase and upkeep);

5. Whether the named insured had forbidden the first permittee to allow another person to drive the car (others in general or someone else specifically named.)[.]

*Id.* (citations and footnotes omitted).

¶ 21. Regarding the first *Osusky* factor, Unlimited did not consider Lowe the minivan's actual owner. *See id.* It is undisputed that Unlimited held title to the van and that it insured the van. Unlimited also kept a set of keys in the event that someone besides Lowe would need to use the van.[2] Additionally, it exercised some control over the vehicle when management prohibited

---

[2] In his discussion regarding whether Unlimited put on any restrictions on his use of the minivan, Lowe states in his brief, without citation, that he "had sole possession of the vehicle keys." This is not an undisputed fact, however, as Bellart

Lowe from using the van to deliver pizzas—a fact that, while contradicted by Lowe, is corroborated, in our view, by the fact that Unlimited prohibited him from using the van after the accident. Moreover, while Lowe was himself uncertain about what would happen to the van should he discontinue his employment with Unlimited, testimony from Unlimited personnel was unequivocal that Unlimited would take possession of the van should Lowe decide to leave.

¶ 22. Regarding the second factor, the restrictions imposed by Unlimited, *see id.*, show that the car belonged to Unlimited, not Lowe. As explained more fully in part (a) above, even acknowledging Lowe's testimony that management "preferred" he not use the van for pizza deliveries rather than outright prohibiting it, there was plenty of evidence in the record that management did prohibit the use of the van for delivering pizzas for another company. Additionally, Unlimited prohibited Lowe from using the van after the accident.

¶ 23. The third factor, whether Unlimited knew, and did not object to, Lowe's giving third parties permission to use the minivan, *see id.*, does not directly apply in this case because the issue is whether Lowe gave permission to himself. However, even if we were to apply it in this case, our analysis would favor Unlimited because there was evidence in the record that Unlimited management restricted the use of the van for delivering pizzas, a task that benefitted a third party, Pizza Hut. Thus, in that particular circumstance Lowe would have been prohibited from overriding management's directions to give permission to himself.

testified that Unlimited had an extra set of keys in case someone else needed to use the van.

¶ 24. Regarding the fourth factor, Lowe's "financial interest in the car," including "purchase and upkeep," was not as strong as Unlimited's interest. *See id.* While the van did substitute for a raise in this case, and while Lowe did pay for gas and routine maintenance, there is no evidence that Unlimited in any sense "gave" the van to Lowe. As noted, testimony from Unlimited personnel was unequivocal that Unlimited would take possession of the van should Lowe decide to leave, which places the primary financial interest in Unlimited's favor. Similarly, the fact that management thought it was "wrong" and "unfair" that Lowe used the van to make money for himself and Pizza Hut rather than Unlimited shows that Unlimited had a greater financial interest in the van. Finally, Unlimited, not Lowe, paid to insure the vehicle.

¶ 25. The fifth factor, whether Unlimited had forbidden Lowe from allowing others to drive the car, *see id.*, does not directly apply here. As with the third factor, this is because the issue before us does not involve a third party. We must conclude, however, that an analysis under this factor favors Unlimited because Unlimited did prohibit Lowe from driving the van for a particular purpose—*i.e.,* delivering pizzas for Pizza Hut—that benefitted a third party.

¶ 26. Therefore, because the application of the *Osusky* factors squarely places ownership with Unlimited, we cannot conclude that Lowe was the minivan's "real owner." Consequently, he could not give himself permission to use the minivan for the purpose of delivering pizzas for Pizza Hut.

¶ 27. Finally, while not material to our decision, we also note that even if we were to consider Lowe to be the minivan's "real owner" under *Osusky*, coverage

could still be denied under the terms of the policy listing those qualifying as an "insured" as:

 a) You for any covered "auto."

 b) *Anyone else while using with your permission a covered "auto" you own, except* . . .

 (2) *Your "employee" if the covered "auto" is owned by that "employee"* or a member of his or her household."

(Emphasis added.) In other words, Lowe cannot have it both ways; he cannot claim that he ought to be covered because, as the "real owner" under *Osusky*, permission is implied, while at the same time avoiding the exclusion denying coverage when an employee actually does own the vehicle in question.

 *(c) The trial court did not err in declining to give Lowe's proposed jury instruction.*

¶ 28. Lowe also argues that the trial court erred in giving WIS JI—CIVIL 3112 instead of its proposed instruction, which addressed the issue of whether he had implied consent by listing the various *Osusky* factors.

¶ 29. The version of WIS JI—CIVIL 3112, the instruction addressing an automobile owner's granting permission to use an automobile, given to the jury in this case provides:

> If an owner of an automobile gives his or her permission to another to use his or her automobile, that person has the right to use the vehicle as long as he or she does not substantially violate the terms and conditions placed upon its use by the owner.
>
> An owner of an automobile may restrict or limit the length of time or the kind of use to which the automobile is to be put by the person using it.

64

If the person, to whom permission was given by the owner, does not obey the restrictions placed upon its use, as those restrictions relate to a period of time, or the purpose for which the car was to be used, and you determine that the use was a substantial deviation from the restrictions placed by the owner at the time permission for its use was granted, then you must find that the use of the car was not within the scope of permission.

As used in this instruction, the term "substantial deviation" means that the person borrowing the car exceeded the scope of the permitted use significantly in a way that was clearly not in the contemplation of the parties at the time permission was initially granted by the owner.

The limitations, if any, upon the scope or extent of the permission must be determined from the understanding, either express or implied, between the owner and the person using the car. This understanding is to be determined from all of the facts and circumstances surrounding the granting of permission.

It is for you, the jury, to determine whether under the facts of this case, the owner did restrict the permission given by limiting the time or purpose of such use, and if you find that there were restrictions, whether the user substantially deviated from those restrictions placed upon the car's use by the owner.[3]

---

[3] The full version Wis JI—Civil 3112 also contains the following paragraph:

> A person who uses a car with the owner's permission may allow another person to drive it unless expressly prohibited by the owner from so doing and so long as such driving is within the scope of the permission granted by the owner. Any express prohibition by the owner against another person's driving the car is a valid restriction and must be recognized by you as binding upon the person to whom permission was initially granted.

From our review of the record, it appears this particular paragraph was not submitted in the instruction given to the jury.

¶ 30. Lowe argues that the trial court erred because Wɪs JI—Cɪvɪʟ 3112 does not adequately address implied consent. He also argues that the trial court's allowing counsel to argue the *Osusky* factors in closing arguments does not cure the defect. Lowe further submits that in determining whether he had implied consent, "the jury's focus should have been on what Lowe assumed and not what Unlimited assumed," and that the jury instruction given "failed to inform the jury of that full and proper perspective." We disagree.

¶ 31. "The [trial] court has broad discretion in instructing a jury." *K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 2006 WI App 148, ¶ 33, 295 Wis. 2d 298, 720 N.W.2d 507. We therefore affirm the trial court's choice of jury instructions so long as "the instructions accurately state the law and comport with the facts of record." *Id.* " 'If the overall meaning communicated by the instructions was a correct statement of the law, no grounds for reversal exist.' " *Hanson v. American Family Mut. Ins. Co.*, 2006 WI 97, ¶ 19, 294 Wis. 2d 149, 716 N.W.2d 866 (citations omitted). Moreover, even if we conclude that an instruction was given in error, we will not order a new trial unless the error was prejudicial. *K & S Tool & Die Corp.*, 295 Wis. 2d 298, ¶ 33. " 'An error is prejudicial if it probably and not merely possibly misled the jury.' " *Id.* (citation omitted); *see also Hanson*, 294 Wis. 2d 149, ¶ 19.

¶ 32. We conclude that the trial court did not err in giving Wɪs JI—Cɪvɪʟ 3112, and not Lowe's proposed expanded instruction, to the jury. Wɪs JI—Cɪvɪʟ 3112 accurately stated the law and comported with the facts in the record regarding the issue before the jury: whether Lowe had permission to drive Unlimited's minivan to deliver pizzas for Pizza Hut. *See K & S Tool*

*& Die Corp.*, 295 Wis. 2d 298, ¶ 33. The instruction more than adequately explained the concept of implied consent, providing:

> The limitations, if any, upon the scope or extent of the permission must be determined from the understanding, either express or implied, between the owner and the person using the car. This understanding is to be determined from all of the facts and circumstances surrounding the granting of permission.

¶ 33. The instruction proposed by Lowe, on the other hand, would not have accurately stated the law and comported with the facts in the record. *See id.* Lowe sought to include the *Osusky* factors in its expanded instruction; however, as noted in part (b) of this opinion, two of the *Osusky* factors did not directly apply to the facts of the case. Furthermore—as we explained in part (b), and as the trial court correctly found—the facts of the case do not support the contention that Lowe was in fact the "real owner" of the minivan. For these same reasons, we also do not agree with Lowe's argument that the case before us is analogous to *Christiansen v. Schenkenberg*, 204 Wis. 323, 236 N.W. 109 (1931), in which the supreme court ordered a new trial because the jury instruction regarding an automobile user's implied consent was inadequate. *See id.* at 330–31. In contrast to the case before us, the proposed jury instruction at issue in *Christiansen* would have explained the law more comprehensively, *see id.*, whereas in this case, the proposed instruction would have *inaccurately* explained it. Finally, we are not persuaded by Lowe's unsupported contention that "the jury's focus should have been on what Lowe assumed and not what Unlimited assumed," and that the jury instruction given "failed to inform the jury of that full

and proper perspective." Lowe provides no legal support for this contention, and we will therefore not consider it. *See Madely*, 306 Wis. 2d 312, ¶ 22 n.8.

 *By the Court.*—Judgment affirmed.