**2019 WI App 63**

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.: 2018AP2104

Complete Title of Case:

IN RE THE COMMITMENT OF JAMIE LANE STEPHENSON:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

JAMIE LANE STEPHENSON,

RESPONDENT-APPELLANT.

| | |
|---|---|
| Opinion Filed: | October 29, 2019 |
| Submitted on Briefs: | October 1, 2019 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Stark, P.J., Hruz and Seidl, JJ. |
| Concurred: | |
| Dissented: | |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the respondent-appellant, the cause was submitted on the briefs of *Jefren E. Olson*, assistant state public defender of Madison. |
| Respondent ATTORNEYS: | On behalf of the petitioner-respondent, the cause was submitted on the brief of *Joshua L. Kaul*, attorney general, and *Jennifer R. Remington*, assistant attorney general. |

# COURT OF APPEALS
## DECISION
## DATED AND FILED

### October 29, 2019

**Sheila T. Reiff**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2018AP2104**

**STATE OF WISCONSIN**

Cir. Ct. No.  2011CI1

**IN COURT OF APPEALS**

---

IN RE THE COMMITMENT OF JAMIE LANE STEPHENSON:

STATE OF WISCONSIN,

   PETITIONER-RESPONDENT,

 V.

JAMIE LANE STEPHENSON,

   RESPONDENT-APPELLANT.

---

APPEAL from orders of the circuit court for Dunn County: ROD W. SMELTZER, Judge.  *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1    STARK, P.J. Jamie Stephenson appeals an order denying his petition for discharge from his commitment as a sexually violent person under WIS. STAT. ch. 980 (2017-18).[1]  He also appeals an order denying his motion for postcommitment relief.  Stephenson argues the circuit court erred by denying his discharge petition because the State was required—and failed—to present expert testimony that Stephenson was dangerous to others because his qualifying mental disorders made it more likely than not that he would commit a future act of sexual violence.  In the alternative, Stephenson argues that even if such expert testimony was not required, the evidence at his discharge hearing was insufficient to satisfy the State's burden of proof regarding his risk of reoffense.

¶2    We conclude, as a matter of first impression, that the State is not required to present expert testimony in order to meet its burden of proof on the question of future dangerousness in discharge proceedings under WIS. STAT. ch. 980.  We further conclude that the evidence presented at Stephenson's discharge hearing was sufficient to establish that Stephenson's qualifying mental disorders made it more likely than not that he would commit a future act of sexual violence.  We therefore affirm the orders denying Stephenson's discharge petition and his motion for postcommitment relief.

**BACKGROUND**

¶3    Stephenson has a long history of committing sexual assaults.  In 2000, when Stephenson was fifteen years old, he was charged with three counts of

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

fourth-degree sexual assault. He was adjudicated delinquent on one of those counts in April 2001, and the two remaining counts were dismissed but read in at sentencing.

¶4     In 2001 or 2002, Stephenson was adjudicated delinquent in two separate cases on one count of second-degree sexual assault of a child and one count of repeated sexual assault of the same child.[2] Both of those cases involved the same victim, who was a female classmate of Stephenson's. In the first case, Stephenson led the victim "to a secluded area of the high school, forcefully pushed her up against a wall using both hands, pulled down her pants, and began engaging in forced intercourse." The second case was based on four additional assaults. During the first assault, Stephenson "rubbed his groin up and down along the back side of the victim," and when she asked him what he was doing, he laughed and walked away. On two other occasions, Stephenson approached the victim from behind and pressed his groin against her buttocks without her consent. On a fourth occasion, Stephenson followed the victim to a secluded area and tripped her. While she was on the floor, Stephenson lifted her left hand above her head and attempted to put his hand underneath her shirt. The victim fought Stephenson off, and as she fled he stated, "If you tell anyone, I'll kill you."

¶5     In 2004, the State charged Stephenson with two counts of second-degree sexual assault of a child, and he ultimately pled guilty to two counts

---

[2] One document in the appellate record states that these delinquency adjudications occurred in 2001, while another document states that they occurred in 2002. This discrepancy is not material for purposes of this appeal. Stephenson does not dispute that he was adjudicated delinquent of both second-degree sexual assault of a child and repeated sexual assault of the same child in either 2001 or 2002.

of fourth-degree sexual assault in that case. According to a police report, Stephenson—who was nineteen at the time—engaged in sexual intercourse with two fifteen-year-old girls. Stephenson was placed on probation for two years, but his probation was later revoked, and he was sentenced to six months in jail.[3]

¶6    Also in 2004, Stephenson was charged in Minnesota with two counts of first-degree criminal sexual conduct—sexual penetration; two counts of second-degree criminal sexual conduct; and one count of illegal consumption of alcohol. The criminal complaint alleged that Stephenson had sexual intercourse with a twelve-year-old girl on two separate occasions. Stephenson was ultimately convicted of one count of second-degree criminal sexual conduct and was placed on probation for twenty-five years.

¶7    In 2007, Stephenson was charged in Wisconsin with one count of sexual assault of a child under the age of sixteen and one count of third-degree sexual assault. The first charge was based on allegations that Stephenson—who was twenty-two at the time—had sexually assaulted a fourteen-year-old girl. Stephenson began chatting with the victim online and misrepresented to her that he was seventeen years old. He ultimately met the victim at her home, and while they were cuddling, he attempted to remove the victim's shorts and underwear. The victim resisted, and Stephenson then "began rubbing [her] vagina" over her shorts and "pulled [her hand] to his exposed penis." He then "inserted his penis between [the victim's] upper legs … pulling her back and forth."

---

[3] In 2003, Stephenson had been charged with two additional counts of second-degree sexual assault of a child. Those charges were dismissed and read in at sentencing in the 2004 case.

¶8    The second charge in the 2007 case alleged that Stephenson had sexually assaulted a sixteen-year-old girl.  According to the criminal complaint, Stephenson engaged in a "brief consensual kiss" with the victim while watching a movie, but she refused to engage in any further physical activity.  Despite her refusal, Stephenson "pulled down [her] pants and underwear … and engaged in forced intercourse for approximately one minute," until the victim was able to escape.

¶9    Stephenson pled guilty to one count of second-degree sexual assault of a child in the 2007 case, and the third-degree sexual assault charge was dismissed.  In August 2009, he was sentenced to two years of initial confinement, followed by four years of extended supervision.

¶10    In April 2011, the State filed a petition to commit Stephenson as a sexually violent person, pursuant to WIS. STAT. ch. 980.[4]  Following a bench trial in June 2012, the circuit court found that Stephenson qualified as a sexually violent person and ordered him committed to the Department of Health Services for institutional care in a secure mental health facility.

¶11    Stephenson has filed a petition for discharge from his WIS. STAT. ch. 980 commitment every year since 2013.  The petition that is at issue in this appeal was filed in January 2017.  The State conceded that Stephenson was

---

[4] As relevant to this appeal, a sexually violent person is "a person who has been convicted of a sexually violent offense … and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence."  WIS. STAT. § 980.01(7).  The term "mental disorder" means "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence."  Sec. 980.01(2).  "Likely" means "more likely than not."  Sec. 980.01(1m).

entitled to a discharge hearing on that petition, and the hearing took place in October 2017.

¶12    In order to defeat Stephenson's discharge petition, the State needed to prove by clear and convincing evidence that Stephenson still met the criteria for commitment as a sexually violent person.  *See* WIS. STAT. § 980.09(3).  Thus, the State needed to prove that: (1) Stephenson had been convicted of a sexually violent offense; (2) Stephenson had a mental disorder; and (3) Stephenson was dangerous to others because he had a mental disorder that made it more likely than not that he would engage in one or more future acts of sexual violence.  *See* WIS JI—CRIMINAL 2506 (2017); *see also* WIS. STAT. § 980.01(7).  It is undisputed that Stephenson has been convicted of a sexually violent offense.  Accordingly, the evidence at the discharge hearing focused on the second and third elements—i.e., whether Stephenson had a mental disorder and whether he was dangerous to others because of that mental disorder.

¶13    In order to satisfy those elements, the State relied on the testimony of psychologist Donn Kolbeck, a member of the evaluation unit at Sand Ridge Secure Treatment Center where Stephenson has been confined since 2011.  Kolbeck testified that Stephenson suffered from two qualifying mental disorders for purposes of WIS. STAT. ch. 980: (1) other specified personality disorder with antisocial and borderline features; and (2) alcohol abuse disorder.

¶14    As to the alcohol abuse disorder, Kolbeck explained that Stephenson's symptoms were technically "in remission" because he had not used alcohol "during the last 12 months or more" as a result of his placement "in a controlled environment which restrict[ed] his access to alcohol."  Nonetheless, Kolbeck testified there was "evidence that [Stephenson's] alcohol abuse

6

predisposed him to commit … acts of sexual violence." For instance, Kolbeck pointed to Stephenson's own admission during a recent group session that he had "never committed a crime sober." Kolbeck also cited Stephenson's long history of alcohol abuse, which began "at a very early age in childhood" and "progressed to frequent intoxication over time." In addition, Kolbeck observed that Stephenson had "disclosed in the context of various legal documents and reports that his sexual misbehavior was related to his use of alcohol."

¶15    Turning to Stephenson's other mental disorder, Kolbeck defined a "personality disorder" as "an enduring pattern of inner experience and behavior that deviates … markedly from the expectations of the individual's culture leading to impairments[] in cognitions, emotions, interpersonal functioning, and impulse control." He opined that Stephenson's personality disorder was a qualifying mental disorder for purposes of WIS. STAT. ch. 980 because there was a "direct causal connection" between the disorder and Stephenson's "sexually violent behaviors in the community."

¶16    In support of that opinion, Kolbeck noted there was evidence of "a variety of antisocial traits … at work in the period of time that [Stephenson] was sexually reoffending." For example, Kolbeck observed that Stephenson "repeatedly failed to observe societal norms" and "repeatedly engaged in behaviors that were grounds for arrest, including … a total of 13 charges for illicit sexual contact and six convictions for sexual offenses." Moreover, Kolbeck testified that Stephenson had "a history of disregard for and violation of the rights of others" and a "long history of deceitfulness, conning and manipulation in the context of his sexually violent behaviors." Kolbeck also opined that Stephenson exhibited other antisocial traits, including "impulsivity, irritability, consistent irresponsibility and a lack of remorse." Kolbeck testified that all of these

antisocial personality traits "interacted in such a way … to cause that causal connection to sexually violent offending."

¶17    Kolbeck also discussed Stephenson's borderline traits, explaining that Stephenson had a "history of an unstable self[-]image." In addition, Kolbeck emphasized Stephenson's "[s]elf[-]damaging impulsivity," as evidenced by his "sexually impulsive promiscuous sexual encounters in the community and also by virtue of his impulsive use of alcohol."

¶18    Kolbeck next discussed the specific circumstances of Stephenson's 2007 offenses. He observed that Stephenson had "engage[d] in conning and manipulation to gain access to a pubescent victim." He also highlighted Stephenson's pattern of sexual assaults, emphasizing that Stephenson had continued to reoffend despite being repeatedly charged, convicted, and punished for his conduct.

¶19    Kolbeck also testified regarding Stephenson's behavior while committed. He acknowledged that Stephenson had not received a behavior dispositional record—the most serious behavioral sanction at Sand Ridge—during the year preceding the discharge hearing. Nevertheless, he testified that several incidents during that time period provided "evidence of antisocial traits at work." For example, he noted that Stephenson had responded untruthfully to polygraph questioning in November 2016. He also observed that during a February 2017 polygraph, Stephenson admitted to making an unauthorized phone call, which indicated a continuing "resistance to rules."

¶20    Kolbeck further testified that Stephenson had violated Sand Ridge's rules by repeatedly covering his room's window with a towel. When confronted by staff about that conduct, Stephenson falsely stated that he had received

permission to cover his window from another staff member, which Kolbeck characterized as deceitful and manipulative conduct.

¶21    Kolbeck also testified that Stephenson had repeatedly requested clothing that "was not allowed per policies" at Sand Ridge. He specifically cited one incident in which Stephenson had attempted to order women's "Satan thong underwear." Kolbeck testified that such behavior further demonstrated Stephenson's "resistance to rules" and suggested that he was "pushing boundaries with staff."

¶22    After initially addressing Stephenson's mental disorders, Kolbeck's testimony turned to Stephenson's risk of reoffense. Kolbeck testified that when he had previously evaluated Stephenson in connection with Stephenson's 2016 discharge petition, he had concluded it was more likely than not that Stephenson would "commit a future sexual act of violence in his lifetime." However, following the 2016 evaluation, Kolbeck changed his methodology and began using the Static-99R and the Violence Risk Scale—Sex Offense Version (VRS-SO) to evaluate risk of reoffense, instead of the Static-99R and the Static-2002R. Applying this new methodology, Kolbeck concluded in his 2017 evaluation that Stephenson did not "reach the standard of more likely than not to commit another act of sexual violence or another sexually violent offense."

¶23    In support of that opinion, Kolbeck explained that Stephenson had scored a seven on the Static-99R in 2017, which was "consistent across evaluations throughout [Stephenson's] time at [Sand Ridge]." According to Kolbeck, that score corresponded to an approximately 40.6% risk of being arrested or charged with a sexual offense within ten years of release.

¶24 As to the VRS-SO, Kolbeck explained that he began using that instrument in October 2016 because it "measures treatment change in a quantifiable fashion" and "provides … the best framework for assessing dynamic risk." Kolbeck testified the VRS-SO measures risk by comparing an offender's pretreatment score to a posttreatment score. According to Kolbeck, Stephenson's pretreatment score on the VRS-SO was 35, and his posttreatment score was 27.5, which resulted in a "change score of 7.5."

¶25 Kolbeck acknowledged that, like the Static-99R, the VRS-SO measures risk over a ten-year period, rather than over an offender's lifetime. He also acknowledged that the VRS-SO defines reoffense as being charged with a new crime. He therefore conceded that actuarial instruments like the VRS-SO and Static-99R may underestimate risk because "[t]he majority of sex offenders are not apprehended for every offense they commit, and they are also not charged and convicted for every offense when they are apprehended." However, Kolbeck testified that he accounted for these deficiencies by multiplying Stephenson's base risk rate by "1.2 times … and then another 1.2 times." Using that method, Kolbeck determined that Stephenson's "lifetime risk" of reoffending was 41%.

¶26 Kolbeck also considered Stephenson's score on the Psychopathy Checklist—Revised (PCL-R) when assessing his risk of reoffense. Stephenson scored a twenty-nine on the PCL-R, which Kolbeck opined "is consistent with a high degree of psychopathy." Kolbeck testified the average PCL-R score "for the prison population" is "[r]oughly 23." In his report, which was entered into evidence during the discharge hearing, Kolbeck acknowledged that "[s]ome research indicates that the combination of sexual deviance and a high score on the [PCL-R] increases risk."

¶27 In addition to discussing Stephenson's scores on the various actuarial instruments, Kolbeck also testified regarding several other factors that bore on Stephenson's risk of reoffense. First, Kolbeck acknowledged that "[s]exual recidivism after a single offense does not tend to be as high as sexual recidivism for individuals," like Stephenson, "who have reoffended after multiple offenses." Kolbeck also noted that Stephenson had struggled when placed on supervision for his criminal offenses, committing new offenses and obtaining "[m]ultiple revocations."

¶28 Second, Kolbeck testified that Stephenson's February 2016 nonsuppression penile plethysmograph (PPG) indicated that he was "still aroused to stimuli depicting teenager coercive interactions."[5] The nonsuppression PPG also showed that Stephenson was aroused by "relatively graphic depictions of victims crying or in some form of suffering related to their offense to the behavior that's being depicted." Kolbeck testified that Stephenson's suppression PPG showed that he possessed "the capability to suppress" his arousal. Kolbeck conceded, however, that a PPG cannot measure whether an individual is actually interested in suppressing his urges.

¶29 Third, Kolbeck noted that Stephenson had stated during group treatment sessions that he believed he was "capable of social drinking in the community." Kolbeck acknowledged that was a recent change, as Stephenson had conceded in previous years that he "need[ed] to maintain absolute sobriety" and

---

[5] Kolbeck explained that during a nonsuppression PPG, "[i]ndividuals are encouraged to freely express their arousal to the depictions of sexual interactions provided" and are "not asked to suppress anything." In contrast, a suppression PPG "tests the patient[']s ability to use mental strategies or mental interventions to suppress his experience of sexual arousal."

"didn't want to even live with people who drank." In addition, Kolbeck observed that Stephenson was "somewhat resistant" when other group members challenged him about his ability to drink socially.

¶30 Fourth, while Kolbeck testified that Stephenson had made significant progress in treatment, he also noted that Stephenson had recently been "dropped from a phase three maintenance group," apparently based on his absences from group sessions. In addition, Stephenson had discontinued his participation in an intensive alcohol education group. Kolbeck further conceded that staff at Sand Ridge had expressed "concern" about Stephenson's "treatment engagement."

¶31 Despite these concerns, Kolbeck ultimately stood by his opinion—based in large part on Stephenson's performance on the various actuarial instruments—that Stephenson's risk of reoffending was only 41%. He therefore opined that it was not more likely than not that Stephenson would commit a future act of sexual violence.

¶32 The State rested following Kolbeck's testimony, and Stephenson then moved for a directed verdict. He argued the State had not met its burden to prove that he was "more likely than not to reoffend in a sexually violent way" because the State had not introduced any expert testimony to that effect. The State responded that it did not need to introduce an expert opinion that Stephenson was more likely than not to reoffend in order to meet its burden of proof, and the circuit court could determine Stephenson's risk of reoffense based on the other evidence presented. The court took Stephenson's motion under advisement, and the defense presented its case.

¶33 The first witness for the defense was psychologist Darren Matusen, who testified regarding Stephenson's progress in treatment. Matusen testified that

12

Stephenson had been in the third phase of a three-phase treatment program since August 2016. According to Matusen, Stephenson "typically attends and participates in his group sessions" and "is willing to address issues in treatment," indicating "positive treatment engagement." Matusen further testified that although Stephenson was still "callous at times," he had recently demonstrated "more empathy for his peers when they [were] struggling." In addition, while Stephenson still experienced "grievance thinking, which is a victim stance perception of the world as being against one and sometimes blaming one[']s circumstances on others," he had begun to deal with his grievance thinking "in healthy, more adaptive ways."

¶34 Matusen also testified that while Stephenson had a "history of minimizing the seriousness of his sexual offenses," he had recently acknowledged that adolescents are incapable of consent and had therefore accepted responsibility for his past crimes. However, on cross-examination, Matusen conceded that in 2016 Stephenson had estimated that his own risk of committing another sexual assault was "approximately five out of ten."

¶35 The defense's second witness at the discharge hearing was psychologist Courtney Endres. Endres opined that Stephenson no longer met the statutory criteria for commitment as a sexually violent person because he no longer suffered from a qualifying mental disorder and because he was not more likely than not to reoffend.

¶36 Like Kolbeck, Endres used the Static-99R and the VRS-SO to assess Stephenson's risk of reoffense. And also like Kolbeck, Endres testified that Stephenson scored a seven on the Static-99R. In her report, which was entered into evidence at the discharge hearing, Endres opined that a score of seven "means

that Mr. Stephenson is most similar to groups of sex offenders of whom 27 percent were charged or convicted of a new sexual offense within the initial five years following their release." Unlike Kolbeck, Endres did not use the high-risk/high-needs group when evaluating Stephenson's risk of reoffense using the Static-99R. She also did not use that instrument to calculate Stephenson's ten-year risk of reoffending.

¶37 Endres next testified that Stephenson's "change score" on the VRS-SO was ten. She explained that by combining that score with Stephenson's score on the Static-99R, she determined Stephenson had a "ten percent risk [of reoffending] over five years and 17 [percent] at ten years."

¶38 After considering the evidence summarized above, the circuit court concluded that Stephenson continued to meet the criteria for commitment as a sexually violent person, and it therefore denied his discharge petition. However, the court granted Stephenson supervised release, after concluding he had satisfied the criteria set forth in WIS. STAT. § 980.08(4)(cg).

¶39 Stephenson subsequently filed a motion for postcommitment relief, raising two issues. First, he argued the State had failed to meet its burden of proof at the discharge hearing because no expert had testified that it was more likely than not he would commit a future act of sexual violence. Second, he argued that even if expert testimony was not required to prove his risk of reoffense, the State had nevertheless failed to present sufficient evidence to meet its burden of proof on that element.

¶40 The circuit court denied Stephenson's postcommitment motion, following a hearing. The court concluded the State was not required to present expert testimony that Stephenson was more likely than not to reoffend in order to

14

meet its burden of proof. The court further concluded that the evidence at the discharge hearing was sufficient to establish that it was more likely than not Stephenson would commit a future act of sexual violence. Stephenson now appeals.

## DISCUSSION

### I. Expert testimony

¶41     As below, Stephenson argues on appeal that the State was required to introduce expert testimony that it was more likely than not he would commit a future act of sexual violence. Because the State failed to do so, Stephenson argues it failed to meet its burden to prove that he was dangerous, and the circuit court therefore erred by denying his discharge petition.

¶42     As a general matter, expert testimony is admissible if, among other things, "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." WIS. STAT. § 907.02(1). In certain circumstances, Wisconsin courts have held that expert testimony is required in order for a party to prove its case. However, "[b]efore expert testimony is held to be a prerequisite, it must be found that the matter is not within the realm of ordinary experience and lay comprehension." *White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557 (1989). In other words, "[t]he requirement of expert testimony is an extraordinary one, and is to be applied by the [circuit] court only when unusually complex or esoteric issues are before the jury." *Id.* Whether expert testimony is required in a given case is a question of law that we review independently. *Racine Cty. v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶24, 323 Wis. 2d 682, 781 N.W.2d 88.

¶43 As the State points out, there is no authority holding that a factfinder's determination of future dangerousness in a Wis. Stat. ch. 980 case must be supported by an expert opinion that the defendant is more likely than not to reoffend. *See State v. Kienitz*, 227 Wis. 2d 423, 439-40, 597 N.W.2d 712 (1999) (noting that "[n]either [the Wisconsin Supreme Court], nor the United States Supreme Court have squarely addressed whether expert testimony is required for a determination on the question of future dangerousness," and declining to address that issue because expert testimony had been introduced in *Kienitz* "on the issue of future acts of sexual violence"); *see also State v. Mark*, 2008 WI App 44, ¶51, 308 Wis. 2d 191, 747 N.W.2d 727 ("[W]e are aware of no case holding that a finding of future dangerousness must be supported by expert testimony."). Nonetheless, Stephenson argues this court should hold that such testimony is required, as a matter of first impression. We decline to do so.

¶44 Stephenson's main argument for requiring expert testimony regarding future dangerousness rests on the premise that future dangerousness is "an extension of" the "threshold determination of whether the person has a mental disorder." As Stephenson notes, a finding of dangerousness for purposes of Wis. Stat. ch. 980 requires a determination that a person is dangerous to others "*because* he or she suffers from a mental disorder *that makes it likely* that the person will engage in one or more acts of sexual violence." *See* Wis. Stat. § 980.01(7) (emphasis added). In other words, Stephenson argues there must be proof of a "nexus" between the person's mental disorder and his or her dangerousness. Stephenson further contends—and the State does not dispute— that expert testimony is required to establish that a defendant has a mental

16

disorder, as that term is used in ch. 980.[6] Because expert testimony is required to establish the mental disorder element, and because the mental disorder element must share a nexus with the dangerousness element, Stephenson argues "it follows that expert testimony is also required to prove … that the person is dangerous to others."

¶45 We agree with Stephenson that a person's dangerousness for purposes of WIS. STAT. ch. 980 must be connected to his or her mental disorder. However, as the State aptly observes, "in testifying that a person has a qualifying mental disorder, [an] expert has already linked a person's dangerousness to his [or her] mental disorder." This conclusion follows because for purposes of ch. 980, the term "mental disorder" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity *that predisposes a person to engage in acts of sexual violence*." WIS. STAT. § 980.01(2) (emphasis added). Thus, when an expert testifies that a person suffers from a qualifying mental disorder, he or she is necessarily testifying that the disorder predisposes the person to commit sexually violent acts.

¶46 The dangerousness element, in turn, requires the factfinder to determine the likelihood of a person's risk of reoffense given the predisposition created by his or her mental disorder. We agree with the State that this

---

[6] In *State v. Sorenson*, 2002 WI 78, ¶20, 254 Wis. 2d 54, 646 N.W.2d 354, our supreme court stated that WIS. STAT. § 980.05(4)—which pertains to the proof needed to commit an individual as a sexually violent person in the first instance—"contemplates that the state must put forth expert evidence showing the respondent's mental disorder." The *Sorenson* court also read *State v. Post*, 197 Wis. 2d 279, 306, 541 N.W.2d 115 (1995), as "specifically contemplat[ing] that mental disorder must be proven through expert examination." *Sorenson*, 254 Wis. 2d 54, ¶20 n.3.

determination does not require expert testimony. Rather, once an expert has testified to the existence of a qualifying medical disorder that predisposes the person to commit acts of sexual violence, it is within the realm of lay comprehension to determine the likelihood that the person will act on his or her predisposition based on factors such as the person's criminal history, his or her performance on supervision, the person's progress in treatment, and an expert's general testimony about the nature of the person's mental disorder and any applicable risk factors that may be predictive of recidivism. *See Kienitz*, 227 Wis. 2d at 436, 441 (discussing, generally, factors that a factfinder may consider when assessing a person's risk of reoffense). While an expert opinion regarding the person's risk of reoffense will likely be helpful to the factfinder in making this determination, we reject Stephenson's argument that such testimony is required in order for the State to meet its burden of proof.

¶47     Stephenson also relies on *Wal-Mart Stores, Inc. v. LIRC*, 2000 WI App 272, 240 Wis. 2d 209, 621 N.W.2d 633, in support of his argument that expert testimony is required to prove dangerousness. In that case, Wal-Mart fired an employee following an outburst at work. *Id.*, ¶3. The employee alleged that the outburst was caused by his obsessive compulsive disorder (OCD) and that, as a result, Wal-Mart had illegally terminated his employment due to a disability. *Id.*, ¶¶1, 4-6.

¶48     The issue on appeal was whether the employee needed to present expert testimony in order to establish that his OCD caused the outburst that led to his firing. *Id.*, ¶16. We concluded such expert testimony was necessary because there was "nothing in the record from which we might conclude that the symptoms and manifestations of OCD are 'within the realm of the ordinary experience of [humankind].'" *Id.*, ¶17 (quoting *Cramer v. Theda Clark Mem'l Hosp.*, 45

Wis. 2d 147, 150, 172 N.W.2d 427 (1969)). We therefore held that "the question of whether [the employee's] OCD caused him … to commit the alleged insubordination for which he was fired" was "sufficiently 'complex or technical' that a lay fact finder 'without the assistance of expert testimony would be speculating' on the matter." *Id.* (quoting **Cramer**, 45 Wis. 2d at 152). We further stated that "[w]hether a causal link exist[ed] between [the employee's] disability and the conduct which triggered his firing" was "a question of medical/scientific fact." *Id.*, ¶19.

¶49 **Wal-Mart Stores** is distinguishable because the dispositive issue in that case was whether the employee's disability actually caused the conduct that led to his firing. In this case, as discussed above, there was expert testimony that Stephenson suffered from mental disorders that predisposed him to commit acts of sexual violence. After accepting that testimony, the circuit court, in its role as factfinder, was required to determine Stephenson's risk of reoffense in the future—i.e., whether it was more likely than not that Stephenson would commit a future act of sexual violence. We agree with the State that assessing risk in this context is an issue within the realm of a layperson's ordinary experience, unlike the question of actual causation that was at issue in **Wal-Mart Stores**. Therefore, we reject Stephenson's contention that the State was required to introduce expert testimony that Stephenson was more likely than not to commit a future act of sexual violence in order to meet its burden of proof on that element.

**II. Sufficiency of the evidence**

¶50 Stephenson next argues that even if expert testimony was not required regarding his risk of reoffense, the State nevertheless failed to meet its burden to prove that his mental disorders make it more likely than not that he will

engage in a future act of sexual violence.[7] "We utilize the criminal standard of review to determine whether there is sufficient evidence to prove a person was a sexually violent person subject to commitment." *Kienitz*, 227 Wis. 2d at 434. Accordingly, we will not reverse an order denying a discharge petition based on insufficient evidence unless the evidence, viewed most favorably to the State and the commitment, is so insufficient in probative value and force that it can be said as a matter of law that no factfinder, acting reasonably, could have found by clear and convincing evidence that the defendant still met the criteria for commitment as a sexually violent person. *See id.*

¶51    If any possibility exists that the factfinder could have drawn the appropriate inferences from the evidence at the discharge hearing to find that the defendant was still a sexually violent person, then we may not overturn the order denying discharge, even if we believe the factfinder should not have so found based on the evidence before it. *See id.* at 434-35. The factfinder, not this court, "determines issues of credibility, weighs the evidence and resolves conflicts in testimony." *Id.* at 435. Moreover, the factfinder is "free to weigh [conflicting expert testimony] and decide which was more reliable; to accept or reject the testimony of any expert, including accepting only parts of an expert's testimony; and to consider all of the non-expert testimony" when deciding whether the State met its burden of proof. *Id.* at 441 (citation omitted).

---

[7] Stephenson concedes on appeal that the evidence at the discharge hearing was sufficient to establish that: (1) he has been convicted of a sexually violent offense; and (2) he suffers from qualifying mental disorders. Stephenson challenges the sufficiency of the evidence only as to whether his mental disorders make it more likely than not that he will engage in a future act of sexual violence.

¶52     In this case, the State offered compelling evidence that Stephenson was more likely than not to commit a future act of sexual violence.  First, the State relied on Stephenson's extensive record of committing sexual assaults.  In *Kienitz*, our supreme court noted the circuit court had properly considered the defendant's "substantial number of prior sexual offenses" when assessing his risk of reoffense. *Id.* at 437.  The court explained, "The fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness.  Indeed, this concrete evidence generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." *Id.* at 437 n.10 (quoting *Jones v. United States*, 463 U.S. 354, 364 (1983)).  Thus, when assessing Stephenson's risk of reoffense, the circuit court could properly consider the fact that, by Kolbeck's count, Stephenson had been arrested for thirteen charges of illicit sexual contact and had six convictions for sexual offenses, and that he continued committing sexual assaults even after being repeatedly charged, convicted, and punished for that conduct.  In addition, the court could properly consider Kolbeck's testimony that "[s]exual recidivism after a single offense does not tend to be as high as sexual recidivism for individuals who have reoffended after multiple offenses."

¶53     Second, the State introduced evidence at the discharge hearing regarding Stephenson's poor performance on supervision.  In particular, Kolbeck testified that Stephenson had struggled when placed on supervision, committing new offenses and obtaining "[m]ultiple revocations."  A defendant's performance on supervision is a proper factor for consideration when assessing his or her risk of reoffense. *See id.* at 437.

¶54     Third, the State introduced evidence regarding Stephenson's violations of institutional rules while confined at Sand Ridge.  For instance,

Kolbeck testified that Stephenson had admitted making an unauthorized phone call and had attempted to order prohibited clothing, including women's "Satan thong underwear." According to Kolbeck, both of those incidents demonstrated a continuing "resistance to rules." Kolbeck also testified that Stephenson had repeatedly covered his room's window with a towel, and when confronted by staff, he falsely stated that another staff member had given him permission to do so. Kolbeck characterized that behavior as both deceitful and manipulative.

¶55 Fourth, the State introduced troubling evidence about Stephenson's attitude and beliefs regarding his alcohol abuse disorder. Kolbeck testified there was "ample evidence" that Stephenson's use of alcohol was "a condition that predisposed him to engage in acts of sexual violence." Stephenson himself had previously admitted that he had "never committed a crime sober." Nonetheless, Kolbeck testified that during recent group sessions, Stephenson had stated he believed he was "capable of social drinking in the community."

¶56 Fifth, there was evidence at the discharge hearing that in 2016 Stephenson had estimated that his own risk of committing another sexual assault was "approximately five out of ten." Thus, as of that time, Stephenson himself believed there was a fifty-fifty chance that he would reoffend if released.

¶57 Sixth, Kolbeck testified that Stephenson's February 2016 nonsuppression PPG indicated that he was still aroused by "stimuli depicting teenager coercive interactions" and by "relatively graphic depictions of victims crying or in some form of suffering." Although Stephenson's suppression PPG showed that he was capable of suppressing his arousal, Kolbeck conceded the test could not measure whether Stephenson was actually interested in suppressing his

urges. That consideration is highly relevant given that discharge would place Stephenson in an unsupervised community setting.

¶58 Seventh, Kolbeck noted that: (1) Stephenson had recently been "dropped from a phase three maintenance group" based on absences from group sessions; (2) Stephenson had discontinued his participation in an intensive alcohol education group; and (3) staff at Sand Ridge had expressed "concern" about Stephenson's "treatment engagement." The circuit court could appropriately consider these factors when assessing Stephenson's likelihood of reoffense. *See Kienitz*, 227 Wis. 2d at 436.

¶59 Eighth, Kolbeck testified that Stephenson had scored a twenty-nine on the PCL-R, which was "consistent with a high degree of psychopathy." In his report, Kolbeck acknowledged the existence of research indicating that "the combination of sexual deviance and a high score on the [PCL-R] increases risk."

¶60 The evidence summarized above provided an ample basis for the circuit court to find that Stephenson was more likely than not to engage in a future act of sexual violence. Nevertheless, Stephenson argues the State presented no "substantive evidence for the … court to use to decide for itself what Stephenson's risk really [was], leaving the court to speculate on that issue." However, both Kolbeck and Endres testified that Stephenson had scored a seven on the Static-99R. Kolbeck testified that score corresponded to an approximately 40.6% risk of being arrested or charged with a sexual offense in the next ten years. Yet, Kolbeck also acknowledged that the Static-99R measures a ten-year risk of reoffense, whereas WIS. STAT. ch. 980 is concerned with an offender's lifetime risk of committing another act of sexual violence. Kolbeck further conceded that actuarial risk assessments may underestimate risk because they do not account for

unreported and uncharged offenses. Thus, based on Kolbeck's testimony and report, the court could reasonably find that Stephenson's score on the Static-99R underestimated his risk of reoffense.[8]

¶61    Ultimately, Stephenson's argument regarding the sufficiency of the evidence asks us to reweigh the evidence in the light most favorable to the defense. However, our standard of review prevents us from doing so. We must instead view the evidence in the light most favorable to the State and the commitment. *See* **Kienitz**, 227 Wis. 2d at 434. Applying this standard, we cannot conclude the evidence in this case was so insufficient that no reasonable factfinder could have determined that Stephenson was more likely than not to commit a future act of sexual violence. *See id.* We therefore affirm the order denying Stephenson's petition for discharge and the order denying postcommitment relief.

    *By the Court.*—Orders affirmed.

---

[8] Stephenson asserts that Kolbeck made "careful efforts to account for undetected offenses and lifetime risk" when assessing Stephenson's risk of reoffense. However, Stephenson also concedes that the circuit court "was not required to credit" those efforts.