# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP2104 |

| | |
|---|---|
| COMPLETE TITLE: | In re the commitment of Jamie Lane Stephenson:<br><br>State of Wisconsin,<br>        Petitioner-Respondent,<br>   v.<br>Jamie Lane Stephenson,<br>        Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 389 Wis. 2d 322,935 N.W.2d 842
PDC No:2019 WI App 63 - Published

| | |
|---|---|
| OPINION FILED: | December 18, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 14, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Dunn |
|   JUDGE: | Rod W. Smeltzer |

JUSTICES:
REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, HAGEDORN, and KAROFSKY, JJ., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion in which DALLET, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Jefren E. Olsen* assistant state public defender. There was an oral argument by *Jefren E. Olsen*.

For the petitioner-respondent, there was a brief filed by *Donald V. Latorraca*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Donald V. Latorraca*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP2104
(L.C. No. 2011CI1)

STATE OF WISCONSIN      :      IN SUPREME COURT

**In re the commitment of Jamie Lane Stephenson:**

**State of Wisconsin,**

      **Petitioner-Respondent,**

      **v.**

**Jamie Lane Stephenson,**

      **Respondent-Appellant-Petitioner.**

**FILED**

**DEC 18, 2020**

Sheila T. Reiff
Clerk of Supreme Court

---

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ZIEGLER, HAGEDORN, and KAROFSKY, JJ., joined. ANN WALSH BRADLEY, J., filed a dissenting opinion in which DALLET, J., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA GRASSL BRADLEY, J. Jamie Lane Stephenson seeks review of the court of appeals decision[1] affirming the circuit court's denial[2] of his Chapter 980 petition for discharge

---

[1] State v. Stephenson, 2019 WI App 63, 389 Wis. 2d 322, 935 N.W.2d 842.

[2] The Honorable Rod W. Smeltzer, Dunn County Circuit Court, presided.

from his commitment as a sexually violent person. Stephenson raises three issues. First, he contends that Chapter 980 requires the State to present expert testimony in order to prove he is dangerous because his mental disorder makes it more likely than not that he will re-offend in a sexually violent manner. Because the State failed to do so, Stephenson asserts there is insufficient evidence to continue his Chapter 980 commitment. Second, Stephenson asks this court to overrule the sufficiency-of-the-evidence standard of review this court adopted in Curiel.[3] Third, he claims that even if expert testimony is not required, and even if we do not overrule Curiel, the evidence was nevertheless insufficient to support the circuit court's decision denying his petition for discharge.

¶2 We hold the State is not required to present expert testimony to prove the required dangerousness element in Wis. Stat. § 980.01(7) (2017-18).[4] We further reject Stephenson's request to overrule Curiel and, instead, reaffirm Curiel's holding that the appropriate standard of review to use in Chapter 980 cases is the sufficiency-of-the—evidence test set forth in our criminal law. Finally, we hold the evidence of record satisfies the sufficiency-of-the-evidence standard. We affirm the decision of the court of appeals.

I. BACKGROUND

---

[3] In re Commitment of Curiel, 227 Wis. 2d 389, 597 N.W.2d 697 (1999).

[4] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

2

¶3 Stephenson has a lengthy history of committing sexual assaults. In 2000, when he was 15 years old, the State charged Stephenson with three counts of fourth-degree sexual assault. One of these charges resulted in a delinquency adjudication. In 2001, Stephenson sexually assaulted a high school classmate. In that case, Stephenson led the student to a secluded area of the high school, forcefully pushed her up against a wall, pulled down her pants, and began engaging in forced intercourse. Stephenson was subsequently adjudicated delinquent for second-degree sexual assault of a child.

¶4 In 2004, Stephenson engaged in sexual intercourse with two 15-year-old girls. The State charged Stephenson with two counts of second-degree sexual assault of a child, and he later pled guilty to two counts of fourth-degree sexual assault of a child. The circuit court placed him on two years of probation. Also in 2004, Stephenson engaged in sexual intercourse with a 12-year-old girl in Minnesota when he was 19 years old. The State of Minnesota charged Stephenson with one count of second-degree criminal sexual conduct. Stephenson was ultimately convicted of this charge and placed on 25 years of probation.

¶5 In 2007, Stephenson corresponded with a 14-year-old girl over the internet and lied to her about his age. When he eventually met her face-to-face, Stephenson pinned her down and forced her to engage in sexual intercourse. That same year, Stephenson restrained a 16-year-old girl and forcibly engaged in sexual intercourse with her while her parents were away. The girl was eventually able to escape.

3

¶6 For these incidents in 2007, the State charged Stephenson with two counts of sexual assault of a child. Stephenson subsequently pled guilty to one count of second-degree sexual assault of a child and, in 2009, was sentenced to two years of initial confinement followed by four years of extended supervision. In 2011, as Stephenson's release date neared, the State filed a petition to qualify Stephenson as a "sexually violent person," pursuant to Wis. Stat. ch. 980. The circuit court committed Stephenson to a secure mental health facility.

¶7 In 2017, Stephenson petitioned the circuit court to discharge him from commitment. The State opposed Stephenson's release. The circuit court considered his petition and conducted a discharge trial. In order to continue Stephenson's commitment on the basis that he remained a "sexually violent person," the State was required to prove three elements by clear and convincing evidence: (1) that he has been convicted of a sexually violent offense [hereinafter the "first element"],[5] (2) that he has a mental disorder that predisposes him to acts of sexual violence [hereinafter the "second element"],[6] and (3) that he is dangerous to others because the mental disorder makes it more likely than not that he will engage in one or more future

---

[5] "Sexually violent offense" is defined in Wis. Stat. § 980.01(6).

[6] In full, "mental disorder" is defined as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." Wis. Stat. § 980.01(2).

4

acts of sexual violence [hereinafter the "third element"]. Wis. Stat. § 980.01(7).

¶8 At the discharge trial, there was no dispute over the first element: Stephenson had been convicted of a host of sexually violent offenses. In order to establish the second element, the State introduced testimony from an expert witness, Donn Kolbeck, a psychologist employed by the Department of Health Services (DHS) who had previously evaluated Stephenson. Kolbeck testified that he diagnosed Stephenson with two qualifying mental disorders: (1) Other Specified Personality Disorder, with antisocial and borderline features, and (2) Alcohol Abuse Disorder.

¶9 Kolbeck testified that Stephenson's personality disorder meant that he possesses an "enduring pattern of inner experience and behavior that deviates . . . markedly from the expectations of the individual's culture leading to impairments[] in cognitions, emotions, interpersonal functioning, and impulse control." Kolbeck further stated that Stephenson exhibits "a long history of deceitfulness, conning and manipulation in the context of sexually violent behaviors, impulsivity, irritability, consistent irresponsibility, and a lack of remorse." According to Kolbeck, Stephenson's personality disorder "has a direct causal connection to [his] sexually violent behaviors in the community."

¶10 With regard to the other qualifying mental disorder, Kolbeck testified that, while Stephenson's symptoms were in remission given his controlled environment, Stephenson's "use of

5

alcohol . . . was a condition that predisposed him to engage in acts of sexual violence." He further testified that Stephenson's alcohol consumption grew heavily over time, progressing to "frequent intoxication" during his life. According to Kolbeck, Stephenson also admitted that he had "never committed a crime sober" and that he was still "capable of social drinking" in the community.

¶11 Additionally, Kolbeck testified regarding Stephenson's numerous rule violations while committed. Noting that Stephenson's anti-social traits were "still active," Kolbeck explained that Stephenson repeatedly covered his room window with a towel, despite contrary instructions from staff. When confronted with this violation, Stephenson lied, claiming this behavior had been allowed by other unit staff members. Additionally, while in confinement, Stephenson had been cited repeatedly for trying to obtain property that he was not allowed to have. In one case, Stephenson violated the rules by ordering women's lingerie——an item expressly prohibited under the facility's policies.

¶12 Kolbeck also stated that Stephenson produced a concerning result on a non-suppressed penile plethysmograph test, during which Stephenson became aroused by stimuli "depicting teenager coercive interactions" as well as by graphic depictions of "victims crying or in some form of suffering" related to sexual deviancy. Kolbeck testified that Stephenson tested highly on measures of psychopathy, as quantified by the Psychopathy Checklist—Revised (PCL-R). While most individuals

in the "prison population" score "roughly 23" on the PCL-R, Stephenson scored a "29," which is "consistent with a high degree of psychopathy." Kolbeck opined that these indicators suggest that Stephenson manifests characteristics of shallow affect, grandiosity, and manipulation.

¶13 Next, Kolbeck addressed the third element: whether Stephenson's mental disorder makes it more likely than not that he will engage in one or more future acts of sexual violence. In opining on this issue, Kolbeck employed two actuarial risk instruments to measure Stephenson's risk of future dangerousness: the Static-99R and the Violence Risk Scale—Sex Offense Version (VRS-SO). Based on these assessment tools, Kolbeck concluded that Stephenson had a 41 percent probability of re-offending. Importantly, Kolbeck defined "re-offense" as the probability of Stephenson being arrested or charged with a sexual crime, not his actual likelihood of committing future acts of sexual violence. Stephenson's score on this instrument (41 percent) was lower than the "more likely than not" standard required for the third element. As a result, Kolbeck concluded that, under this measure, Stephenson did not satisfy the third element.

¶14 Following Kolbeck's testimony, Stephenson introduced his own expert witness, Courtney Endres, a psychologist whose evaluation of Stephenson supported his discharge petition. With respect to the second element, Endres testified that Stephenson "no longer meets the criteria for a mental disorder as defined under Wisconsin Chapter 980." As to the third element, Endres

7

opined that Stephenson's "risk falls below the threshold" and that he "is not likely to reoffend in the future." Although Endres used the same Static-99R and VRS-SO instruments employed by Kolbeck, Endres applied slightly different risk assessment factors and determined that Stephenson posed a 10 percent risk of re-offense over five years and a 17 percent risk over ten years. Accordingly, Endres concluded that Stephenson no longer met the statutory criteria for commitment as a sexually violent person.

¶15 Stephenson also presented testimony from Darren Matusen, a psychologist at Stephenson's treatment facility. Matusen explained Stephenson's intensive three-phase treatment program during commitment and stated that Stephenson was in phase three of this program. He opined that Stephenson had made progress in his treatment, even though he "is still callous at times." He also stated that, while Stephenson "has a history of minimizing the seriousness of his sexual offenses," he has more recently "acknowledged that adolescents are incapable of consent" and has "taken responsibility" for his crimes. Matusen also testified that, during the previous year, Stephenson assessed his own risk of re-offending as a "five out of ten" chance.

¶16 After hearing all of the testimony, the circuit court denied Stephenson's discharge petition, finding that he remained a sexually violent person. The court ruled that, based upon Kolbeck's testimony, Stephenson suffers from both of the aforementioned mental disorders and "does have a risk to

8

reoffend." Nonetheless, the circuit court acknowledged that Stephenson "has made significant progress" in his treatment and therefore granted him supervised release pursuant to Wis. Stat. § 980.08(4)(cg).

¶17 Following the circuit court's determination, Stephenson filed a motion for postcommitment relief. In his motion, Stephenson conceded the first two elements of the criteria for commitment as a "sexually violent person," challenging only the third element. Stephenson argued the State failed to meet its burden of proof on the third element because no expert testified that he was more likely than not to commit a future act of sexual violence. Specifically, Kolbeck testified that Stephenson's risk of arrest or conviction for committing future acts of sexual violence was only 41 percent, a figure failing to satisfy the "more likely than not" standard, Stephenson argued. Stephenson further claimed that, even if expert testimony was not required for the third element, the State's evidence was insufficient to prove that Stephenson was dangerous. The circuit court denied this motion, holding that the State was not required to present expert testimony on the third element and that the State presented sufficient evidence to deny his discharge. Stephenson appealed, and the court of appeals affirmed the circuit court's ruling. We granted Stephenson's petition for review.

## II. STANDARD OF REVIEW

¶18 Stephenson asks this court to interpret Wisconsin's sexually violent person commitment laws under Wis. Stat. ch. 980

9

and to consider whether expert testimony is required to continue a commitment.  This court reviews questions of statutory interpretation "independently, [while] . . . benefit[ing] from the decisions by the court of appeals and circuit court."  In re Commitment of Talley, 2017 WI 21, ¶24, 373 Wis. 2d 610, 891 N.W.2d 390; see also Racine Cnty. v. Oracular Milwaukee, Inc., 2010 WI 25, ¶24, 323 Wis. 2d 682, 781 N.W.2d 88.  Additionally, Stephenson asks this court to overrule Curiel and adopt a different standard of reviewing whether the evidence is sufficient to uphold the factfinder's determination that a person is sexually violent.  The standard of review we apply presents a question of law that we review de novo.  See In re Commitment of Curiel, 227 Wis. 2d 389, ¶¶52-53, 597 N.W.2d 697 (1999).

## III.  DISCUSSION

### A. Expert Testimony for Chapter 980 Proceedings

¶19  Stephenson contends that, during Chapter 980 discharge trials, the State must present expert testimony to satisfy its burden of establishing the third element:  that the committee is dangerous to others because his mental disorder makes it more likely than not that he will engage in one or more future acts of sexual violence.  Wis. Stat. § 980.01(7).  Stephenson asserts that, because the State's expert witness failed to testify Stephenson was "more likely than not to reoffend," the circuit court wrongfully denied his petition for discharge.  We are not persuaded.

10

¶20 In essence, Stephenson asks this court to breathe requirements into a Wisconsin statute that are textually absent. Nowhere does Wis. Stat. ch. 980 require expert testimony for determinations of a committee's dangerousness, nor should this court invade the province of the legislature to create a rule out of whole cloth. Indeed, the legislature is capable of enacting such language if it chooses. In Wis. Stat. § 980.07(1), for example, the legislature requires that expert examiners conduct "reexamination[s] of the person's mental condition . . . [every] 12 months to determine whether the person has made sufficient progress for the court to consider whether the person should be . . . discharged." Similarly, the legislature expressly invites courts to hear expert testimony when a committee denies the facts in a petition alleging that he is sexually violent. Wis. Stat. § 980.031.[7] Not so for § 980.09. While this court could mandate expert witness testimony to support the third element, we decline to do so. "The requirement of expert testimony is an extraordinary one, and [it is applied] by the trial court only when unusually complex or esoteric issues are before the jury." White v. Leeder, 149 Wis. 2d 949, 960, 440 N.W.2d 557 (1989).[8] This court

---

[7] "If a person who is the subject of a petition filed under § 980.02 denies the facts alleged in the petition, the court may appoint at least one qualified licensed physician, licensed psychologist, or other mental health professional to conduct an examination of the person's mental condition and testify at trial." Wis. Stat. § 980.031.

[8] The dissent cites the "Basic Guide to Wisconsin Small Claims Actions" for the proposition that Wisconsin "acknowledges

rightly refuses to read words into a statute that are simply not there, and this case is no exception. See Bruno v. Milwaukee Cnty., 2003 WI 28, ¶16, 260 Wis. 2d 633, 660 N.W.2d 656.

¶21 As a general matter, expert testimony may be admissible at trials if, inter alia, "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Wis. Stat. § 907.02(1).[9] But within the context of Chapter 980,

---

the need for" expert testimony from a "full-time mechanic or a repair person" in a "motor vehicle faulty repair case." Dissent, ¶¶58-59. Neither the guide nor Wisconsin law says that. Setting aside the fact that "[t]his document is only a general guide" and not the law, the language cited by the dissent simply says that if a party is planning to present the testimony of an expert witness, it is "almost always necessary" to have the expert testify in person:

> Having the expert witness testify in person is almost always necessary. Merely repeating what your expert told you will probably not be allowed. A written statement or affidavit from the expert witness will not be sufficient.

While "My Cousin Vinny" certainly established how compelling expert testimony can be regarding the characteristics of a car, the dissent's claim that "this court acknowledges the need for an expert to testify even in a small claims motor vehicle faulty repair case" is plainly wrong.

[9] Contrary to the dissent's construction of Wis. Stat. § 907.02(1), nothing in the text of this statute requires the admission of expert testimony; to the contrary, its language is permissive rather than mandatory, affording the trial court the discretion to admit expert testimony if it will "assist the trier of fact":

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify

determinations of future dangerousness rest soundly within the purview of lay factfinders. Courts recognize factfinders to be quite adept at understanding how an individual's criminal history, admissions of wrongdoing (or lack thereof), performance on supervision, or progress in treatment inform his likelihood of committing future acts of violence. See, e.g., State v. Randall, 2011 WI App 102, ¶¶9-10, 19, 336 Wis. 2d 399, 802 N.W.2d 94 (holding that, in a case involving a petitioner's commitment on grounds of insanity, the factfinder properly concluded that the petitioner's past crimes and poor behavior during commitment showed that he "still pose[d] a danger to society"); Estelle v. Smith, 451 U.S. 454, 472 (1981) (discussing the important role of a factfinder in assessing an individual's future danger to society).

¶22 In this case, Kolbeck testified that, based on calculations using Static-99R and VRS-SO, Stephenson had a 41 percent risk of re-offending, which he defined as the risk of being arrested and charged with a crime of sexual violence. While this is below the threshold of "more likely than not," a factfinder could reasonably determine that other evidence, separate from these actuarial instruments, weighs in favor of continued commitment based on the likelihood of Stephenson

---

thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

committing future acts of sexual violence, regardless of whether he ultimately faced arrest or charges as a result.  For example, Kolbeck testified that Stephenson scored disproportionately high on measures of psychopathy, repeatedly violated the treatment facility's policies, and generated a concerning result on his non-suppressed penile plethysmograph test.  Weighing these additional factors falls squarely within the comprehension and competency of lay factfinders.  After all, in a variety of other sorts of cases, a factfinder's principal duty involves reviewing the entire panorama of evidence, weighing its significance, and drawing conclusions therefrom.[10]  See, e.g., Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (discussing how factfinders must weigh the evidence and draw reasonable inferences in criminal trials); Lang v. Lowe, 2012 WI App 94, ¶¶16-18, 344 Wis. 2d 49, 820 N.W.2d 494 (discussing how factfinders appropriately weigh evidence in civil actions).

¶23  No Wisconsin appellate court has ever required trial courts to hear expert testimony on the third element.  More than two decades ago, this court expressly declined to create such a rule and held that the circuit court properly considered the State's other evidence——namely, that the committee had a 25-year

---

[10] Of course, this is not to say that a factfinder would not benefit from hearing expert testimony on the third element.  As the State admits, it may often prove difficult for the State to demonstrate without an expert a committee's likelihood of engaging in future acts of sexual violence sufficient to render him dangerous to others.  But to mandate expert testimony is an entirely different matter.

14

criminal history, was deliberately violating his rules of supervision, and was in denial of his need for treatment. In re Commitment of Kienitz, 227 Wis. 2d 423, ¶31, 597 N.W.2d 712 (1999) (stating that, "[b]ecause there was expert testimony on the issue of future acts of sexual violence in this case," it need not opine on whether "expert testimony is required as a matter of law."). Likewise, the United States Supreme Court has never required experts to testify on "future dangerousness" either. In Estelle v. Smith, 451 U.S. 454, 472 (1981), the Court held that, on the issue of capital sentencing procedures (which require a determination of "dangerousness"), "the jury's resolution of the future dangerousness issue is in no sense confined to the province of psychiatric experts." In another case, the Court stated that experts should not have the only say in whether or not an individual is dangerous, given that lay juries and courts can "sensibly" arrive at such conclusions. Barefoot v. Estelle, 463 U.S. 880, 896 (1983) (superseded by statute on other grounds).

¶24 Stephenson relies heavily upon Wal-Mart Stores, Inc. v. LIRC, 2000 WI App 272, 240 Wis. 2d 209, 621 N.W.2d 633, as well as Brown County Human Services v. B.P., 2019 WI App 18, 386 Wis. 2d 557, 927 N.W.2d 560, for his assertion that the State is required "to present expert opinion testimony that the respondent is dangerous." Both cases are inapposite. In Wal-Mart Stores, an employee brought an employment discrimination suit alleging that his employer fired him because of his obsessive-compulsive disorder (OCD). 240 Wis. 2d 209, ¶¶2-3.

15

The court of appeals held that the employee needed to present expert testimony in order to prove that his OCD caused the behavior that led to his firing. Id., ¶16. While the employee's therapist testified regarding the employee's OCD diagnosis, she provided no evidence that the OCD caused the behaviors triggering his firing. Id., ¶23. In the absence of such expert testimony, the court of appeals concluded the Labor and Industry Review Commission erred in determining that Wal-Mart discriminated against the employee on the basis of his disability. Id., ¶1. Similarly, the court of appeals in B.P. decided that a parent facing termination of parental rights needed to present expert testimony to support his assertion that his psychological condition caused him not to visit or communicate with his child. 386 Wis. 2d 557, ¶48. Without such expert testimony, the court concluded that the trier of fact would have to speculate. Id., ¶49. Unlike either of those cases, in this Chapter 980 proceeding, an expert witness did supply the causal link between Stephenson's mental disorder and his prior sexually violent behaviors. Kolbeck testified that Stephenson's personality disorder "has a direct causal connection to [his] sexually violent behaviors in the community."

¶25 Notwithstanding this linkage established by expert testimony, Stephenson nevertheless argues that the holdings of Wal-Mart Stores and B.P. should prohibit a factfinder from determining that a committee is dangerous to others without an expert witness opining that the committee's mental disorder

16

makes it more likely than not that he will engage in one or more _future_ acts of sexual violence. We disagree. The rule applied in <u>Wal-Mart Stores</u> and <u>B.P.</u> does not fit the factfinder's determination under Wis. Stat. § 980.01(7). Unlike the third element of that statute, the inquiries requiring expert testimony in <u>Wal-Mart Stores</u> and <u>B.P.</u> were entirely retrospective, involving whether mental health conditions caused behaviors that had already occurred. The issue in <u>Wal-Mart Stores</u> was whether the employee's _past_ conduct was caused by his mental disorder; similarly, the issue in <u>B.P.</u> was whether the parent's _past_ conduct was caused by his psychological condition——both decidedly different inquiries than in Chapter 980 cases, in which any proffered expert testimony would inform the committee's propensity to commit _future_ acts of sexual violence. In other words, the court of appeals deemed expert testimony necessary to establish a causal link between the employee's disorder and the conduct for which he was fired in <u>Wal-Mart Stores</u>, as well as to establish a causal link between the father's psychological condition and the conduct for which the State sought to terminate his parental rights in <u>B.P.</u> Both of these considerations fall beyond the competence of the lay factfinder, who, without expert testimony, cannot determine whether a mental health condition or a disorder did in fact cause particular behaviors. In contrast, the third element under Wis. Stat. § 980.01(7) asks the factfinder to make a risk assessment regarding the likelihood the committee will engage in

17

future acts of sexual violence, a predictive determination long regarded as well within the province of the lay factfinder.

¶26 Significantly, Chapter 980 cases involve a multitude of supplemental evidence pertinent to the third element that is simply irrelevant in employment discrimination and termination of parental rights cases. In discharge proceedings, the State typically presents evidence of the committee's progress in treatment, his performance on psychometric evaluations, and the nature of his mental disorder. The factfinder in Chapter 980 cases has a comprehensive range of evidence at its disposal when assessing whether an individual's mental disorder makes it more likely than not that he will re-offend in a sexually violent manner——a characteristic often lacking in ordinary civil disputes involving psychological evaluations. In this respect, among others, Chapter 980 cases are an entirely different species of law compared to ordinary civil disputes. After all, "[t]he primary goals and purposes of ch. 980 are to treat sexually violent persons and to protect society from the danger posed by those persons," and the array of evidence available to factfinders reflects these consequential aims. In re Commitment of West, 2011 WI 83, ¶27, 336 Wis. 2d 578, 800 N.W.2d 929.

¶27 Nonetheless, Stephenson maintains that the language of Wis. Stat. § 980.01(7) suggests that expert testimony is required to prove that an individual is dangerous to others because his mental disorder makes it more likely than not that he will commit future acts of sexual violence. Stephenson's argument rests upon his interpretation of language in State v.

18

Sorenson, 2002 WI 78, ¶20, 254 Wis. 2d 54, 646 N.W.2d 354, indicating that § 980.05(4) "contemplates that the state must put forth expert evidence showing the respondent's mental disorder." According to Stephenson's argument, because the statute directly links the mental disorder to the individual's likelihood to re-offend in a sexually violent manner, if expert testimony is required to prove the existence of a mental disorder, expert testimony must also be required for the third element. We are unpersuaded.

¶28 As a preliminary matter, whether Wis. Stat. § 980.05(4) requires expert testimony to establish a committee's mental disorder was not an issue before the court in Sorenson. It is not necessary for us to resolve that issue in this case either. As Stephenson concedes, Kolbeck's diagnoses supply sufficient evidence to establish that Stephenson has a mental disorder that predisposes him to acts of sexual violence. The State's expert linked Stephenson's mental disorder with his potential for recidivism (thereby satisfying the second element) and it was the factfinder's role to then determine whether

Stephenson's mental disorder made him more likely than not to commit a future act of sexual violence (the third element).[11]

¶29  As Chapter 980 makes clear, a "mental disorder" is a "congenital or acquired condition affecting the emotional or volitional capacity that <u>predisposes</u> a person to engage in acts of sexual violence."  Wis. Stat. § 980.01(2) (emphasis added). Accordingly, when an expert testifies to a committee's mental disorder, he establishes that the committee has a predisposition for acts of sexual violence.  The next statutory step involves assessing the likelihood the committee will commit such acts in the future.  Logically, when ascertaining a committee's potential for committing acts of sexual violence in the future, the factfinder necessarily ties its determination to the predisposition produced by the mental disorder.  In other words, when providing testimony sufficient to establish the second element, the expert lays the foundation for any forthcoming evidence pertinent to the third element.  Because the determination of whether the committee is more likely than not to engage in future acts of sexual violence remains squarely

---

[11] The dissent misconstrues the court's statutory analysis by suggesting that the "majority's interpretation of Wis. Stat. § 980.01(7) erroneously collapses the required statutory elements from three to two."  Dissent, ¶61.  Of course, simply because expert testimony is not required for the third element does not mean that the element falls away.  The dissent misunderstands the simple issue in this case, which is whether expert testimony is necessary to determine whether it is more likely than not that the committee will engage in future acts of sexual violence.  The court's conclusion that the answer to this inquiry falls within the purview of the factfinder does not mean this statutory element disappears.

within the purview of the factfinder, expert testimony on the third element may inform the factfinder's decision but it is not necessary to conclude that a person is sexually violent.

B. Sufficiency-of-the-Evidence in Chapter 980 Appeals

¶30  Stephenson next asks us to overrule Curiel and depart from the sufficiency-of-the-evidence standard of review courts have been using for over 20 years.  Under Curiel, appellate courts review Chapter 980 cases by asking whether "the evidence, when viewed most favorably to the state and [the commitment], is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found [the person sexually violent] beyond a reasonable doubt" at an initial commitment trial and by "clear and convincing evidence" at a discharge trial.  See In re Commitment of Curiel, 227 Wis. 2d 389, ¶52, 597 N.W.2d 697 (citation omitted); Wis. Stat. §§ 980.05(3) (at an initial commitment trial, the State must prove "beyond a reasonable doubt" that the individual is a sexually violent person) and 980.09(3) (at a discharge trial, the State must prove "by clear and convincing evidence" that the individual still meets the criteria for commitment as a sexually violent person).  This sufficiency-of-the-evidence test is the same standard that we apply in reviewing criminal convictions.  Curiel, 227 Wis. 2d 389, ¶53.  Stephenson asks us to jettison this standard and instead apply independent review to whether the evidence satisfied the legal standard for dangerousness.  We see no reason to do so.

21

¶31 In Curiel, the court concluded that, because Chapter 980 proceedings "share[] many of the same procedural and constitutional features present in criminal prosecutions," courts must apply the criminal standard of review to Chapter 980 cases. Id., ¶54. Although it is true that Curiel partly relied upon a now-repealed statute to support its holding,[12] many of the same rights recognized for criminal defendants continue to apply to committees in Chapter 980 proceedings. As provided by Wis. Stat. §§ 980.03(2) and (3), sexually violent offenders have the right to remain silent, to be provided with counsel, to request jury trials at initial commitment, to have the State prove initial commitment "beyond a reasonable doubt," and to present and cross-examine witnesses. Like criminal trials, Chapter 980 proceedings also demand that the State turn over "[a]ny exculpatory evidence" which may inform a committee's right to discharge. Wis. Stat. § 980.036(2)(j). Indeed, although criminal trials and Chapter 980 proceedings possess important differences (e.g., the latter is not for purposes of punishment), their relevant procedures are decidedly analogous——a fact properly recognized by Curiel. If Chapter 980 proceedings and criminal actions "parallel" each other in substantive respects, as Curiel noted, then it only makes sense that these cases have mirroring standards for reviewing

---

[12] Wisconsin Stat. § 980.05(1m) has since been legislatively repealed. See 2005 Wis. Act 434 §§ 101, 131(1). This statute provided that "[a]ll constitutional rights available to a defendant in a criminal proceeding are available to the [individual subject to commitment proceedings]."

22

challenges to the sufficiency of the evidence.  Curiel, 227 Wis. 2d 389, ¶55.

¶32  In asking this court to uproot established case law, Stephenson omits any discussion of Wisconsin's commitment to the doctrine of stare decisis.  This court respects the doctrine of stare decisis and will not overturn precedent absent a "special justification."  State v. Roberson, 2019 WI 102, ¶49, 389 Wis. 2d 190, 935 N.W.2d 813 (citation omitted).  "This court follows the doctrine of stare decicis scrupulously because of [its] abiding respect for the rule of law," and "[this] court's decision to depart from precedent is not to be made casually." Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257; see also Progressive N. Ins. v. Romanshek, 2005 WI 67, ¶41, 281 Wis. 2d 300, 697 N.W.2d 417.  Typically, we explore five factors before deciding whether to overturn precedent and we are "more likely" to do so only "when one or more of the following circumstances is present:  (1) [c]hanges or developments in the law that have undermined the rationale behind the decision; (2) there is a need to make a decision correspond to newly ascertained facts; (3) there is a showing that the precedent has become detrimental to coherence and consistency in the law; (4) the prior decision is 'unsound in principle'; or (5) the prior decision is 'unworkable in practice.'"  Bartholomew v. Wisconsin Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 21.

23

¶33 At no point does Stephenson grapple with these factors. In particular, he never asserts why the current standard is "unworkable" or "unsound," nor does he identify any newly-ascertained facts about Chapter 980 proceedings or inconsistencies in the law that would justify overturning Curiel. At best, Stephenson's argument impliedly invokes the first factor, based upon the state legislature's repeal of Wis. Stat. § 980.05(1m) years after the Curiel decision. As previously explained, this statutory change did nothing to undermine the rationale underlying the Curiel decision. Chapter 980 proceedings have much in common with criminal actions, warranting analogous standards of review. While this court is not "barred from pursuing a sound and prudent course for the sake of upholding its prior precedent," Stephenson's failure to even mention the doctrine of stare decisis while urging us to upend well-established precedent fatally foils his argument. Johnson Controls, 264 Wis. 2d 60, ¶96.

### C. The Evidence is Sufficient.

¶34 Stephenson further argues that, even without mandating expert testimony for the third element or overturning Curiel, the circuit court nonetheless lacked sufficient evidence to deny his motion for postcommitment relief or to find that he remained a sexually violent person.[13] Again, we are not persuaded.

---

[13] Stephenson concedes that he has been previously convicted of a sexually violent offense and that he suffers from a mental disorder that predisposes him to acts of sexual violence.

24

¶35 Applying the Curiel standard, we will not reverse an order denying a discharge motion based on insufficient evidence "unless the evidence, viewed most favorably to the state and [the commitment], is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found" the person sexually violent by "clear and convincing evidence" at a discharge trial. See Curiel, 227 Wis. 2d 389, ¶52 (citation omitted). The court of appeals correctly concluded that the evidence was more than sufficient to uphold the circuit court's denial of Stephenson's petition for discharge.

¶36 The facts of this case disproportionately weigh against Stephenson. First, Stephenson's criminal history proves his penchant for re-offending in a sexually violent manner. From 2000 to 2007, Stephenson was convicted six times for violent sexual behavior against children. Some of these crimes occurred while he was on probation for past offenses. Furthermore, Stephenson's comments and conduct during his time in the treatment facility indicate he is still unable to control his behavior. Stephenson repeatedly violated the rules of the treatment facility and, at least on one occasion, attempted to obtain sexually-suggestive clothing that he knew was banned. When confronted with these indiscretions, Stephenson proceeded to concoct lies and exhibit anti-social behavior.

¶37 Moreover, the results of Stephenson's non-suppressed penile plethysmograph test also support the circuit court's finding. As Kolbeck testified, Stephenson became aroused by

stimuli "depicting teenager coercive interactions" as well as by graphic depictions of "victims crying or in some form of suffering." In addition, Stephenson scored highly on measures of psychopathy, reflecting his propensity for exhibiting shallow affect, grandiosity, and manipulation. These psychometric scores correspond to Kolbeck's personal evaluations of Stephenson, which show that he continually exhibited traits of impulsivity, irritability, deceitfulness, and lack of remorse. A reasonable factfinder could conclude, as did the circuit court, that Stephenson would, more likely than not, act upon his sexual urges if released into the community.

¶38 Perhaps most importantly, the circuit court afforded appropriate weight to the results generated by Kolbeck's actuarial instruments, in light of all of the evidence presented. While Kolbeck's conclusion that Stephenson posed a 41 percent risk of being <u>arrested</u> and <u>convicted</u> of a crime of sexual violence falls below the "more likely than not" threshold, the statutory inquiry examines the likelihood Stephenson would commit future acts of sexual violence, irrespective of whether he might be apprehended for, or convicted of, such crimes. Taking into account the evidence as a whole, a reasonable factfinder could conclude that Stephenson met the "more likely than not" threshold for future dangerousness. Given that Stephenson continually exhibited traits of manipulation and deceit, a factfinder could reasonably conclude that Stephenson's actual risk of committing future acts

26

of sexual violence, while nonetheless evading the law, was "more likely than not."

¶39 Lastly, Kolbeck's testimony was sufficient to establish the nexus between Stephenson's mental disorders and his potential for recidivism.  In particular, although Stephenson's Alcohol Abuse Disorder was then in remission given his confinement, Stephenson expressed a willingness to engage in "social drinking" if released into the community——a troubling statement for an individual who has "never committed a [sexual assault] sober."  Moreover, Kolbeck stated that Stephenson's personality disorder "has a direct causal connection to [his] sexually violent behaviors in the community"——an equally disconcerting observation considering that Stephenson's anti-social traits were "still active."  Given these facts, a reasonable factfinder could conclude, as the circuit court did, that Stephenson would likely exhibit behaviors corresponding to these disorders and thereby pose a danger to the community.

IV.  CONCLUSION

¶40 We conclude the court of appeals did not err in upholding the circuit court's order denying Stephenson's petition for discharge from his Chapter 980 commitment.  We reject all three of Stephenson's arguments.  First, we hold the State is not required to present expert testimony to prove that a person is dangerous because his mental disorder makes it more likely than not that he will re-offend in a sexually violent manner.  The statutes do not require expert testimony on that element and we decline to create a rule not set forth in the

text.  Second, we reaffirm the sufficiency-of-the evidence test articulated in <u>Curiel</u> as the appropriate standard of review for challenges to a Chapter 980 commitment.  Finally, our review of the record reveals overwhelming evidence from which a reasonable factfinder could have found that Stephenson continues to satisfy the definition of a "sexually violent person."  Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶41 ANN WALSH BRADLEY, J. *(dissenting).* In its application, Chapter 980 of the Wisconsin Statutes rides on the cusp between constitutionality and unconstitutionality. Although civil in nature, it gives the government power to lock up individuals indefinitely——including for life——even though they have already completed their criminal sentence. All recognize that a significant liberty interest is at stake here.

¶42 In order to ensure that Chapter 980 falls on the constitutional side of the divide, enhanced procedural safeguards are afforded to respondents. Rather than applying the rules that normally attend a civil law proceeding, some criminal law procedural safeguards are instead applied to provide added protections in order to survive constitutional challenges.

¶43 The majority opinion undermines this delicate balance in two ways. First, it erroneously determines that expert testimony is not required to establish the causal link that Wis. Stat. § 980.01(7) requires: that the individual is more likely than not to engage in future acts of sexual violence because of the diagnosed mental disorder. In reaching its erroneous determination, the majority either ignores or misconstrues precedent related to the necessity of expert testimony and effectively collapses the elements for determining a sexually violent person from three to two.

¶44 Additionally, the majority errs by perpetuating the Curiel[1] standard of review framework. Under the guise of

---

[1] State v. Curiel, 227 Wis. 2d 389, 416-417, 597 N.W.2d 697 (1999).

1

acknowledging the need for enhanced procedural safeguards available to Chapter 980 respondents, the majority actually leaves respondents with diminished protection. The standard of review that it applies saddles the respondent with a nearly insurmountable burden to overcome when reviewing the sufficiency of the evidence.

¶45 By examining the causal requirement set forth in Wis. Stat. § 980.01(7), and in light of what United States Supreme Court precedent demands as well as what our Wisconsin precedent and statutes require, I arrive at a conclusion contrary to that of the majority. I determine that due process demands, and our precedent and statutes require, that expert testimony be presented in order to establish the causal link between an individual's mental disorder and the risk that the individual is more likely than not to engage in future acts of sexual violence.

¶46 I further determine that when reviewing the sufficiency of the evidence on the issue of future dangerousness, appellate courts must apply a two-step standard of review that is applied in other cases of constitutional fact. When applying this framework, questions of historical fact should be accorded deference, while the question of whether the facts meet a required legal standard presents a question of law that is subject to independent appellate review. I see no justification (and the majority offers none) for applying a more onerous standard of review in Chapter 980 civil commitments than is applied in Chapter 51 civil commitments, which adhere to the

2

two-step constitutional fact standard of review. See Langlade Cnty. v. D.J.W., 2020 WI 41, ¶47, 391 Wis. 2d 231, 942 N.W.2d 277. In fact, any textual justification for reviewing Chapter 980 cases under a different standard than Chapter 51 cases disappeared with the repeal of Wis. Stat. § 980.05(1m).

¶47 Accordingly, I respectfully dissent.

I

¶48 Wisconsin Stat. § 980.01(7) contains three elements that the State must prove in order to continue Stephenson's Chapter 980 commitment: (1) that he has been convicted of a sexually violent offense; (2) that he suffers from a mental disorder; and (3) that he is dangerous because his mental disorder makes it more likely than not that he will engage in future acts of sexual violence. § 980.01(7). At issue here is whether expert testimony is necessary for the State to prove the required causal link set forth in the third element.

¶49 At the discharge trial, both the State's expert and Stephenson's expert agreed that Stephenson did not meet the third element for continued commitment as a sexually violent person. The State introduced testimony from Dr. Don Kolbeck, a psychologist, to establish the second element necessary to commit Stephenson: that Stephenson suffers from a mental disorder. See Wis. Stat. § 980.01(7). Dr. Kolbeck testified that he had diagnosed Stephenson with two qualifying mental disorders: (1) Other Specified Personality Disorder, with antisocial and borderline features; and (2) Alcohol Abuse Disorder. Majority op., ¶8.

3

¶50 In reaching his opinion that Stephenson did not meet the criteria for the third element necessary to sustain his continued commitment, Dr. Kolbeck discussed Stephenson's progress during his course of treatment along with his performance on two actuarial risk instruments: the Static-99R and the Violence Risk Scale-Sex Offense Version (VRS-SO).[2] The test results indicated that Stephenson had a 41 percent probability of sexual re-offense. Id., ¶13. When called upon to give an opinion regarding the necessary third element, Dr. Kolbeck concluded based on Stephenson's progress in treatment and test results that he did not satisfy the more likely than not standard for continued commitment. Id.; see Wis. Stat. § 980.01(1m) (defining "likely" as "more likely than not").

¶51 Stephenson introduced his own expert witness, Dr. Courtney Endres, who disagreed with the State's expert as to the second element and concluded that Stephenson "no longer [met] the criteria for a mental disorder as defined under Wisconsin Chapter 980." Majority op., ¶14. However, she agreed with Dr. Kolbeck that Stephenson was unlikely to sexually re-offend and thus no longer met the statutory criteria for commitment as a sexually violent person. Id. Endres used the same risk assessment instruments employed by Dr. Kolbeck and determined that Stephenson evinced a 10 percent risk of re-offense over

---

[2] Dr. Kolbeck testified that the VRS-SO provides the best framework for assessing dynamic risk among the available tools. Furthermore, he explained that it provides a meaningful quantification of risk reduction as a result of treatment progress.

five years and 17 percent risk over ten years. Id. Despite both experts testifying that Stephenson did not meet the third element necessary for recommitment, the circuit court denied the discharge petition. Id., ¶16.

II

¶52 With the relevant testimony in hand, I begin with an examination of the of language of Wis. Stat. § 980.01(7). It provides: "'Sexually violent person' means a person who has been convicted of a sexually violent offense . . . , and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence."

¶53 Importantly, the language of the statute requires that there must be a causal nexus between the diagnosed mental disorder and the likelihood of sexual re-offense. That is, in order to be a "sexually violent person" within the meaning of Wis. Stat. § 980.01(7), individuals must be more likely than not to engage in future acts of sexual violence because they suffer from a particular mental disorder. See Wis. Stat. § 980.01(1m).

¶54 Thus, the issue presented here is whether the answers to the following questions are within the common knowledge of the average lay person or do they require some technical knowledge or expertise in order to establish the third element necessary for Stephenson's continued commitment. The questions are:

> Does the mental illness ("other specified personality disorder, with antisocial and borderline features") cause

5

Stephenson to be more likely than not to engage in future acts of sexual violence?

Or, in the alternative, does the mental illness ("alcohol abuse disorder") cause Stephenson to be more likely than not to engage in future acts of sexual violence?

¶55 Although we engage in pages of analysis and legal exegesis, the issue presented is really quite simply addressed. Yes, expert testimony is required. Why? Because the answers call for technical knowledge and expertise beyond that of the average lay person. Such a conclusion is supported by the plain language of Wis. Stat. § 907.02(1). This subsection states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

¶56 Wisconsin courts have long held that expert testimony is required "concerning matters involving special knowledge or skill or experience upon subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study and experience." Cramer v. Theda Clark Mem'l Hosp., 45 Wis. 2d 147, 150, 172 N.W.2d 427 (1969). This case presents such a matter.

¶57 The testimony at issue in this case involves the interpretation of diagnostic tests and the application of data,

6

principles, and methods to the facts of the case. Ultimately, it requires a determination of whether a specific mental illness will more likely than not cause an individual to engage in future acts of sexual violence. This is hardly the daily fare of the average lay person. Expert testimony on these subjects is required, as they concern areas of specialized information outside the realm of ordinary knowledge.

¶58 Such a conclusion is supported by instructions on this court's website when it advises litigants that even in small claims cases where special knowledge or skill is involved, expert testimony is required to prove the case. For example, we instruct litigants that in a small claims motor vehicle faulty repair case that a "full-time mechanic or a repair person" may be sufficient to qualify as the expert and that "[h]aving the expert witness testify in person is almost always necessary" (emphasis added). "Basic Guide to Wisconsin Small Claims Actions", https://www.wicourts.gov/formdisplay/SC-6000V_instructions.pdf?formNumber=SC-6000V&formType=Instructions&formatId=2&language=en, at 10 (Nov. 2019).

¶59 For heaven's sake, if this court acknowledges the need for an expert to testify even in a small claims motor vehicle faulty repair case, then surely an expert is needed to opine on the above technical question. Such an inquiry is firmly within the realm of expert testimony.

¶60 Nevertheless, the State advances that expert testimony is not required to prove that a person's mental disorder will

7

more likely than not cause the person to engage in future acts of sexual violence. According to the State, the common understanding of the jury is sufficient to evaluate the required causal link between the mental disorder and the likelihood of future sexually violent acts. The majority follows suit.

¶61 In the majority's view, by testifying to the second element, the presence of a mental disorder, an expert "lays the foundation for any forthcoming evidence pertinent to the third element." Majority op., ¶29. In essence, the majority's interpretation of Wis. Stat. § 980.01(7) erroneously collapses the required statutory elements from three to two and thereby renders the third element mere surplusage. This is quite a leap. Our case law is clear that, "[s]tatutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110.

¶62 Compounding its error in failing to require expert testimony on the third element, the majority conflates a predisposition for acts of sexual violence with a likelihood that such acts will be committed. In the majority's view, when an expert testifies to the presence of a qualifying mental disorder, they additionally lay the foundation for the third element, whether an individual has a likelihood of sexually violent re-offense. Majority op., ¶28.

¶63 But the majority fails to recognize the distinction between predisposition and probability. Although a respondent may have a predisposition toward acts of sexual violence, the

8

third element of the Chapter 980 analysis is concerned with the probability that sexually violent conduct will occur in the future.

¶64 By conflating the second element of predisposition with the third element of probability, the majority risks raising due process concerns. The majority's belief that a lay factfinder can independently discern the required causal link is little more than a commentary on the ability of lay factfinders to determine general dangerousness. While lay factfinders may be competent to examine varied facts to assess general dangerousness, that is not at issue in this case.

¶65 Chapter 980 cases present an inquiry different than the general criminal law inquiry of future dangerousness and due process concerns place different demands. In Chapter 980 cases, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." State v. Post, 197 Wis. 2d 279, 313, 541 N.W. 2d 115 (1995) (citation omitted). Chapter 980 passes due process muster specifically because it requires a nexus between a respondent's mental disorder and the probability of future dangerousness. State v. Laxton, 2002 WI 82, ¶22, 254 Wis. 2d 185, 647 N.W.2d 784. In other words, the mental disorder must make the individual dangerous in a specific way as opposed to the general dangerousness that accompanies any analysis of potential recidivism. See Kansas v. Hendricks, 521 U.S. 346, 358 (1997). Such an inquiry mandates special expertise.

9

¶66 Stephenson cites also to two Wisconsin cases for the proposition that expert testimony must be presented when making determinations about probability of sexually violent re-offense. See Wal-Mart Stores, Inc. v. LIRC, 2000 WI App 272, 240 Wis. 2d 209, 621 N.W.2d 633; Brown Cnty. Human Servs. v. B.P., 2019 WI App 18, 386 Wis. 2d 557, 927 N.W.2d 560. In both cases, the courts determined that expert testimony was needed to establish the causal link between an individual's mental disorder and the conduct at issue.

¶67 First, in Wal-Mart, an employee asserted that his termination was improperly based on conduct resulting from his mental disorder. Wal-Mart, 240 Wis. 2d 209, ¶25. The employee suffered from obsessive compulsive disorder (OCD), the symptoms of which include the high reactive behaviors that occasioned the termination. Id., ¶2. At issue in the case was whether expert testimony was required to establish the causal link between the employee's mental disorder and the conduct for which he was fired. Id., ¶11.

¶68 The court determined that expert testimony was indeed required to establish that conduct which formed the basis for the employment termination was caused by the employee's disability. Id., ¶¶16-17. Additionally, the court noted that, "[i]nferring the required causal link from the evidence in the present record, without expert testimony on the issue, is speculation, not the drawing of a reasonable inference to which we must defer." Id., ¶25.

10

¶69 Second, B.P. involved a termination of parental rights due to abandonment of a child. B.P., 386 Wis. 2d 557, ¶2. B.P. raised a good cause defense to allegations that he had not visited or communicated with his child for a six-month period by claiming that his mental health diagnoses caused him to do so. Id., ¶43. The court concluded that B.P. needed expert testimony to relate his factual assertions to his good cause defense because making such a causal link was outside of the ordinary experience of humankind. Id., ¶¶48-49. Thus, in both Wal-Mart and B.P., the court reasoned that the establishment of a causal nexus between their conduct and a mental illness required the submission of expert testimony.

¶70 The majority attempts to distinguish these cases, contending that Stephenson's case is about future actions, not past ones. Majority op., ¶25. True enough, but why does this matter? If expert testimony is needed to look at a fully developed fact record and make causal links with the benefit of 20/20 hindsight, then surely no less can be demanded when the trier of fact looks forward on the same basis.

III

¶71 The majority errs next in its discussion of Curiel and the sufficiency of the evidence standard in Chapter 980 cases. It perpetuates the Curiel criminal standard of review under which appellate courts review Chapter 980 cases by asking whether, "the evidence, when viewed most favorably to the state and [the commitment], is so insufficient in probative value and force that it can be said as a matter of law that no trier of

11

fact . . . could have found [the person sexually violent] beyond a reasonable doubt . . . ." Majority op., ¶30; see State v. Curiel, 227 Wis. 2d 389, 416-17, 597 N.W.2d 697 (1999).

¶72 On review, Curiel advocated a two-step constitutional fact standard of review with facts being reviewed under a deferential standard and the application of facts to the legal standard being reviewed independently. Opposing this framework, the State asserted that the criminal standard of review should be applied.

¶73 The Curiel court applied the criminal standard of review without engaging in much analysis. It decried that although each party offered a standard of review, neither party gave any rationale to support its position: "[a]side from describing these competing standards of review, neither party provides reasons why one or the other standard of review is appropriate for ch. 980 proceedings." Curiel, 227 Wis. 2d at 416-17. The Curiel court opted for the criminal law standard of review. At the time, the Curiel court's approach may have found support in Wis. Stat. § 980.05(1m) (1995-96) which provided that, "[all] constitutional rights available to a defendant in a criminal proceeding are available to the [individual subject to commitment proceedings]." Majority op., ¶31 n.12. However, Wis. Stat. § 980.05(1m) was repealed in 2005. See 2005 Wis. Act 434, § 101. Thus, any textual support for applying a more onerous standard of review in Chapter 980 cases than that applied in Chapter 51 cases disappeared with the repeal of the statute.

12

¶74 The majority relies solely on Curiel to support its conclusion. It opines that because Chapter 980 affords enhanced procedural safeguards similar to those found in criminal prosecutions, such as the right to counsel and the right to remain silent, it follows that respondents in Chapter 980 cases should be subject to the criminal standard of review. See Majority op., ¶31. Therein lies the Achilles heel of the majority's analysis.

¶75 Rather than providing more protection to the Chapter 980 respondent in order to successfully straddle the constitutional divide, the majority actually provides less. The criminal standard of review is more onerous than a constitutional fact standard of review. It saddles the respondent in a Chapter 980 commitment with a nearly insurmountable burden to overcome when reviewing the sufficiency of the evidence.

¶76 Adopting the two-part standard of review in Chapter 980 cases is consistent with the way this court reviews civil commitment proceedings under Wis. Stat. § 51.20. Both focus on a determination of dangerousness. In Langlade County v. D.J.W., this court concluded that "[a] determination of dangerousness is not a factual determination, but a legal one based on underlying facts." 391 Wis. 2d 231, ¶47. We concluded that the court of appeals erred for doing the very thing that the majority does today: "applying the standard of review for findings of fact to a legal determination . . . ." Id.

13

¶77 There is no reason to apply different standards of review to assessments of the sufficiency of evidence of dangerousness in Chapter 51 civil commitment and Chapter 980 civil proceedings. In both, the commitment implicates fundamental due process rights because both potentially result in a significant deprivation of liberty. Likely the majority proffers no reason justifying such disparate treatment because no reasonable explanation can be found.

¶78 I conclude that evidence supporting a finding of dangerousness under Chapter 980 should be reviewed using the constitutional fact standard. As explained above, due process concerns circumscribe commitments under Chapter 980 to persons who have a mental disorder that more likely than not will cause them to commit future acts of sexual violence.

¶79 The Chapter 980 context is best served by adopting this two-part standard with facts being reviewed under the clearly erroneous standard and the application of those facts to the legal standard being reviewed independently. As we explained in State v. Phillips, such an approach serves the interests of greater uniformity of application and clarity in the legal standard while taking into account the significant liberty interests at stake in these proceedings:

> [T]he principal reason for independent appellate review of matters of constitutional fact is to provide uniformity in constitutional decision-making. It is the duty of the reviewing court to independently apply constitutional principles to the facts as found by the circuit court because the scope of constitutional protections, representing the basic value commitments of our society, cannot vary from trial court to trial court, or from jury to jury. In applying the skeletal

14

> constitutional rule, appellate courts flesh out the rule and provide guidance to litigants, lawyers, and trial and appellate courts.

State v. Phillips, 218 Wis. 2d 180, 194, 577 N.W.2d 794 (1998) (internal citations and quotations omitted).

¶80 In sum, for the reasons set forth above, I determine that expert testimony is required to establish the causal link between an individual's mental disorder and the risk that the individual is more likely than not to engage in future acts of sexual violence. Because no expert testimony was presented at Stephenson's discharge trial to support this requirement, I conclude that the State failed to meet its burden of proof. Additionally, I determine that the two-step constitutional fact standard of review should be applied to sufficiency of evidence challenges in Chapter 980 proceedings.

¶81 Accordingly, I respectfully dissent.

¶82 I am authorized to state that Justice REBECCA FRANK DALLET joins this dissent.

15